IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MADEN TECH CONSULTING, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, and<br><br>BETA ANALYTICS INTERNATIONAL, INC.,<br><br>Intervenor | ) | No. 06-585<br>(Judge Braden) |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND DECLARATORY RELIEF**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

MICHAEL J. DIERBERG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St. NW
Washington, DC 20530
Telephone: (202) 353-0536

August 22, 2006

Attorneys for Defendant

**TABLE OF CONTENTS**

PAGE(S)

BRIEF . . . . . 1

STATEMENT OF THE ISSUES . . . . . 2

STATEMENT OF FACTS & COURSE OF PROCEEDINGS BELOW . . . . . 2

I. DARPA's Role Within The Department Of Defense . . . . . 2

II. The Support Services To Be Provided Under The Contract . . . . . 4

III. Events Leading To The Award To BAI . . . . . 9

IV. The Override Decision . . . . . 11

ARGUMENT . . . . . 12

I. This Court Should Decline To Address Maden's Claims . . . . . 12

II. In The Alternative, Maden Has Not Demonstrated That DARPA's Decision Was Arbitrary And Capricious . . . . . 13

A. Maden Has The Burden Of Demonstrating That The Agency's Decision Was Arbitrary And Capricious . . . . . 13

B. Maden Has Not Met Its Burden Of Demonstrating That DARPA's Decision Was Arbitrary And Capricious . . . . . 14

1. DARPA's Decision To Override The Stay Was Reasonable . . . . . 14

2. This Court's August 8, 2006 Order In The Beta Analytics Case Does Not Assist Maden . . . . . 17

III. Even If Maden Could Show That DARPA's Decision Was Arbitrary And Capricious, Maden Is Not Entitled To The Relief It Requests . . . . . 19

A. Maden Must Demonstrate Several Factors In Order To Obtain A Temporary Restraining Order Or An Injunction . . . . . 19

B. Maden Has Failed To Demonstrate That It Is Entitled To A Temporary Restraining Order Or Injunctive Relief Based Upon The Four Factors . . . . . 20

**TABLE OF CONTENTS (con't)**

PAGE(S)


1. Maden Has Not Demonstrated A Likelihood Of Success On The Merits . . . . . 21

2. Maden Has Not Identified Any Irreparable Harm . . . . . 21

3. The Balancing Of The Harms Weighs In Favor Of The Government . . . . . 23

4. The Public Interest Weighs In Favor Of The Government . . . . . 24

C. Maden's Attempt To Avoid Demonstrating The Injunctive Factors Is Unavailing . . . . . 25

CONCLUSION . . . . . 26

## TABLE OF AUTHORITIES

CASES PAGE(S)

Advanced Data Concepts, Inc. v. United States,
216 F.3d 1054 (Fed. Cir. 2000) . . . . . . . . . . 13

Bannum Inc., v. United States,
56 Fed. Cl. 453 (Fed. Cl. 2003) . . . . . . . . . . 21, 22

Beta Analytics Int'l, Inc. v. United States,
67 Fed. Cl. 384 (2005) . . . . . . . . . . 9, 16

Beta Analytics Int'l, Inc. v. United States,
69 Fed. Cl. 431 (2005) . . . . . . . . . . passim

Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,
419 U.S. 281 (1974) . . . . . . . . . . 13, 14

Camp v. Pitts,
411 U.S. 138 (1973) . . . . . . . . . . 13

Campbell v. Dep't of Justice,
164 F.3d 20 (D.C. Cir. 1998) . . . . . . . . . . 18

Cincom Sys., Inc. v. United States,
37 Fed. Cl. 266 (1997) . . . . . . . . . . 19, 25

Citizens to Preserve Overton Park v. Volpe,
401 U.S. 402 (1971) . . . . . . . . . . 13

Co-Steel Raritan, Inc. v. ITC,
357 F.3d 1294 (Fed. Cir. 2004) . . . . . . . . . . 14

CSE Constr. Co., Inc. v. United States,
58 Fed. Cl. 230 (2003) . . . . . . . . . . 19, 25

EDP Enter., Inc. v. United States,
56 Fed. Cl. 498 (2003) . . . . . . . . . . 20

Filtration Development Co, LLC v. United States,
59 Fed. Cl. 658 (2004) . . . . . . . . . . 14

**TABLE OF AUTHORITIES (con't)**

PAGE(S)

Kropp Holdings, Inc. v. United States,
63 Fed. Cl. 537 (2005) . . . . . . . . . . 1, 12, 13

Mazurek v. Armstrong,
520 U.S. 968 (1997) . . . . . . . . . . 19

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997) . . . . . . . . . . 19, 21

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) . . . . . . . . . . 14

Newton County Wildlife Ass'n v. Rogers,
141 F.3d 803 (8th Cir. 1998) . . . . . . . . . . 18

OAO Corp. v. United States,
49 Fed. Cl. 478 (2001) . . . . . . . . . . 19, 25

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) . . . . . . . . . . 20, 25, 26

RAMCOR Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999) . . . . . . . . . . 13

Sierra Military Health Services, Inc. v. United States,
58 Fed. Cl. 573 (2003) . . . . . . . . . . 24

STATUTES

5 U.S.C. § 706 . . . . . . . . . . 13

28 U.S.C. § 1491(b)(3) . . . . . . . . . . 14

28 U.S.C. § 1491(b)(4) . . . . . . . . . . 13

31 U.S.C. § 3553(d)(3)(c)(i)(II) . . . . . . . . . . 11

MISCELLANEOUS

Wright & Miller, 11A Fed. Prac. & Proc. Civ.2d § 2948.1 . . . . . . . . . . 22

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MADEN TECH CONSULTING, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, and<br><br>BETA ANALYTICS INTERNATIONAL, INC.,<br><br>Intervenor | No. 06-585<br>(Judge Braden) |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND DECLARATORY RELIEF**

Pursuant to Rules 52.1 and 65 of the Rules of this Court, defendant, the United States, respectfully opposes plaintiff's request for a temporary restraining order, preliminary injunction, permanent injunction, and declaratory relief. The issues in this case center upon a contract with the Defense Advanced Research Projects Agency (DARPA) to provide personnel to assist DARPA in protecting the security of its information from inappropriate disclosure, as required by statute, regulation, and other governing law.

Given the legitimate issues of national security in this case, pursuant to this Court's holding in Kropp Holdings, Inc. v. United States, 63 Fed. Cl. 537 (2005), this Court should decline to address the issues raised by plaintiff, Maden Tech Consulting, Inc. ("Maden"). In the alternative, if the Court addresses Maden's claims, this Court should determine that DARPA's decision to override the automatic stay was not arbitrary and capricious. Therefore, this Court should grant judgment upon the administrative record in favor of the Government. Furthermore,

even if this Court were to conclude that DARPA's decision was arbitrary and capricious, this Court should deny Maden's request for a temporary restraining order, injunction, and declaratory relief.

## STATEMENT OF ISSUES

1. Whether this Court should decline to address Maden's claims because of the legitimate interests of national defense and national security in this case?

2. If this Court addresses Maden's claims, whether Maden has established that DARPA's decision to override the automatic stay was arbitrary and capricious?

3. If this Court addresses Maden's claims and concludes that DARPA's decision to override the stay was arbitrary and capricious, whether Maden is entitled to a temporary restraining order, an injunction, or declaratory relief?

## STATEMENT OF FACTS & COURSE OF PROCEEDINGS BELOW

### I. DARPA's Role Within The Department Of Defense

DARPA is a military research organization within the Department of Defense whose mission is to prevent technological surprise to the United States, and to create technological surprise for our enemies. A582.[1] As described by DARPA's strategic plan, DARPA's goal is to "bridge the gap" between fundamental discoveries, where new science and new concepts typically surface, and more near-term improvements and solutions to known systems and problems. A585-86. DARPA is designed to be a technological engine to accelerate advances that will assist our military and protect our national security. Id.

As described by DARPA's strategic plan,

[1] "A__" refers to the administrative record, filed August 18, 2006.

> DARPA's strategy for accomplishing its mission is embodied in strategic thrusts. . . . Today there are eight strategic thrusts . . . that are important national security research and development areas. They represent focus areas for DARPA involvement and contain the foundations for innovative joint warfighting capabilities to defeat existing and emerging national security threats.

A582. The current strategic thrusts are: (1) detection, precision ID, tracking, and destruction of elusive targets; (2) robust, secure self-forming tactical networks; (3) networked manned and unmanned systems; (4) urban area operations; (5) detection, characterization, and assessment of underground structures; (6) assured use of space; (7) cognitive computing; and (8) bio-revolution. A593-609. Details regarding each strategic thrust are provided in DARPA's strategic plan. Id.

DARPA's major accomplishments include technological advances in missile defense, development of "stealth" technology for aircraft and vessels, and the Global Hawk and Predator unmanned aerial vehicles. A588-89. Many of DARPA's programs have led to innovations currently being utilized in our operations in Iraq and elsewhere. For example, after consultation with Marine Corps officials, DARPA assembled a quick-reaction program designed to develop a system capable of determining the direction from which shots are fired at a moving vehicle. A600-01. This led to the development of the Boomerang shooter detection system, currently deployed in Iraq. Id.; see also A600 (discussing other DARPA efforts to address urgent needs of the Marine Corps in Iraq). Furthermore, several of DARPA's strategic thrusts are directed at addressing the specific type of challenges currently facing our armed services in Iraq and Afghanistan. See, e.g. A599-602 (describing the urban area operations thrust, which addresses the unique challenges of combat in an urban environment); 602-03 (describing the thrust

associated with detection, characterization, and assessment of underground structures such as caves and underground bunkers).

## II. The Support Services To Be Provided Under The Contract

The contract in this case calls for the provision of services to DARPA's Security and Intelligence Directorate. A665. The Security and Intelligence Directorate ("SID") is responsible for ensuring the security of DARPA information and programs. Id. SID has an enormous responsibility within DARPA. DARPA has approximately 120 ongoing Special Access Programs ("SAPs"). A875. These SAPs are spread over 320 different facilities, with over 400 users (companies, organizations, academic institutions, agencies, etc.) performing work related to SAP programs at one of these facilities. Id.

The information generated or exchanged by DARPA and the 400 users connected to SAPs must be protected from improper disclosure at every step of the process. This requires, among other things:

- Personnel security clearances. A668. Each individual associated with a classified program cannot perform any work on the program unless he or she has the appropriate clearance.
- Facility security clearances. A670. A company cannot do classified work unless the company has the appropriate security clearance.
- Passing, certifying and verifying clearances. A671. When a person travels from his home organization to a host organization to conduct classified work, Department of Defense ("DoD") requires that the home organization certify the individual's clearance to the host organization. The host organization must verify

the clearance when the visitor arrives at their location. Unless these processes take place, the work cannot be lawfully conducted.

- Letting of contracts. A668. Letting a classified contract requires that the Government specify security requirements in the contractual documents. This is accomplished through the use of the DD Form 254, Contract Security Classification Specification. The DD Form 254 is drafted specific to the work to be done on the contract, and the inclusion of specific clauses in the contractual document. Without these efforts, the classified work cannot be performed.
- Classification of material. A669. A determination must be made as to what security levels (top secret, secret, or confidential) and as to what accesses (SAP or Sensitive Compartmented Information ("SCI")) are appropriate for the information or material associated with classified work. Each specific piece of the work must be examined for the appropriate classification and access level. For example, it may be necessary to declare the overall effort related to the development of a new system as an unacknowledged SAP at the top secret level. However, some material that is necessary to build the system should not be classified but the association of the material with its intended use and the program should be at the secret SAP level. This evaluation must be repeated with each element of the program and at each phase of the work (concept, concept development, test, demonstration, production, deployment).
- Appropriate public disclosure of information. A669. DARPA, as with any other research entity, thrives on the exchange of information with a broad spectrum of

society, both national and international. The idea is to find good ideas wherever they are, prove they work via accelerated research, and put them to practical use in the hands of our military to preserve technological superiority and save lives. However, the sharing of information must be carefully controlled to prevent the inadvertent disclosure of classified information and to conform to DoD policy and other restrictions.

- Handling and accountability of classified materials. A669-70. Classified documents must be handled, accounted for, and safeguarded to prevent the unauthorized disclosure of the classified information contained in the documents. For example, a classified document may need to be shipped to a contractor, which means that it must be properly marked, packaged (wrapped) and delivered to an authorized location via an authorized means. How it is shipped depends on whether or not it is collateral, SAP, or SCI. Further, the document must be removed from the sending organization's books and receipt by the receiving organization must be determined by the sending organization to assure that it arrived where it was meant to go.
- Information assurance. A668. DARPA, like many other Federal and state agencies and private individuals are under daily attack through cyberspace. These threats constantly evolve and DARPA must be able to thwart these attacks so as to protect DARPA's systems and information. Further, various statutes and acts require that DARPA conduct due diligence of their systems (e.g., Federal Information Security Management Act (FISMA)).

- Certification and accreditation. A669. To assure that information is adequately protected, DoD requires that certain standards be used for the storage and processing of classified information. The process that is used to assure that facilities and computing systems meet these standards is referred to as "certification and accreditation." Briefly stated, the certifying official certifies that a facility or computer system is ready for accreditation and the accrediting official verifies the validity of the certification and accredits the system or facility, by, in the case of a computer system, issuing an authority to operate (ATO). Without the ATO, information cannot be introduced into or maintained in the facility or introduced or maintained on a computer system; consequently, the technicians cannot do their work.
- Identification of personnel. A671. There are various identification cards or badges used as a visual and/or electronic aid to facilitate a person's identification and access to a facility or computer system or both. These range from the DoD-Wide Common Access Card (CAC) which allows a person to log onto a computer and to send digitally signed and encrypted email and to gain access to facilities within the National Capitol Region; to a courier card which authorizes a person to receive and carry classified material; to the DARPA identification badge which identifies the person to DARPA security guards, indicates the person's security clearance level, and provides electronic access to and within the DARPA facility. SID and the contract awardee ensure that these access cards are properly issued and maintained.

SID is thinly staffed, with approximately a dozen employees. A740. Consequently, SID relies heavily upon the contractor to perform the security services described above. The contract requires approximately 69 full time equivalents ("FTEs") to perform a variety of the services described above necessary to fulfill SID and DARPA's mission. A733. All of these individuals are required to possess a top secret security clearance. A688.

Many of the individuals provided under the contract are embedded within specific DARPA technical offices. A674. For example, of the 69 FTEs to be provided by the contractor, approximately 27 are program security representatives. A733. While embedded within a particular technical office, these representatives provide a wide range of the services described above for the specific programs to which they are assigned. A675.

The security requirements fulfilled by the subject contract are not just good practices, they are mandated by statute, regulation, Executive orders, and DoD directives. This governing law is identified in the statement of work and reproduced, in part, in the administrative record. A667; A1-179 (DoD regulation relating to classified information); 180-204 (DoD instruction related to the management, administration, and oversight of SAPs); A205-256 (Directive related to sensitive compartmented information); A257-352 (physical security standards for SCI); 353-571 (DoD overprint relating to SAP security procedures); 649-658 (DoD Directive relating to SAPs); 744-874 (Director of Central Intelligence manual relating to protecting SCI); 876-96 (Executive Order prescribing a uniform system for classifying, declassifying, and safeguarding national security information). DARPA cannot continue to operate without adhering to this governing law.

## III. Events Leading To The Award To BAI

This case arises out of a reprocurement of an earlier award to Maden that this Court concluded was improper. Beta Analytics International, Inc. ("BAI") and Maden were among the companies that submitted proposals in response to solicitation N00174-03-R-0044 ("2003 solicitation"), issued by on October 15, 2003. Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 386 (2005). BAI was the incumbent contractor at that time. Id. at 386. Like the solicitation at issue in the present case, the 2003 solicitation called for the provision of services to assist DARPA's Security and Intelligence Directorate in securing DARPA's information, facilities, and programs. Id. The Government awarded the contract to Maden in mid-March, 2004. Id. at 393. On April 2, 2004, BAI filed a complaint and a motion for a preliminary injunction, alleging, among other things, that the technical evaluation process was arbitrary, capricious, and unlawful. Id.

Maden intervened, and along with the Government, opposed BAI's request for a preliminary injunction pending the Court's decision on the merits. Maden Opp. to PI, Apr. 6, 2004, attached as App. A. Maden noted that a preliminary injunction is a "drastic and extraordinary remedy . . . which is not to be routinely granted." App. A, at 5. Maden contended that BAI was not entitled to a preliminary injunction because, among other things, BAI would not suffer irreparable injury prior to a decision by the Court on the merits of BAI's protest. App. A, at 13-15. The Court denied BAI's request for a preliminary injunction on April 7, 2004. Beta Analytics, 67 Fed. Cl. at 393. Shortly thereafter, BAI's contract came to an end and Maden began performing under the contract. Id. at 393.

On July 29, 2005, this Court issued its decision addressing the merits of BAI's protest. Id. The Court concluded that the award to Maden was arbitrary and capricious, although the Court did not grant any relief to BAI at that time. Id. at 408. On October 5, 2005, the parties submitted a joint status report in which all of the parties agreed that a re-procurement should be ordered for a new contract scheduled to begin on April 10, 2006, when the option year that had already been exercised was to expire. Beta Analytics Int'l, Inc. v. United States, 69 Fed. Cl. 431, 432 (2005). On November 23, 2005, this Court issued its decision addressing the relief to be provided based upon the improper award to Maden. Id. The Court's order directed, among other things:

> The United States . . . [is] hereby PERMANENTLY RESTRAINED AND ENJOINED from exercising another option year under the contract awarded to Maden Tech Consulting, Inc. pursuant to Solicitation No. N00174-03-R-0044.
>
> * * *
>
> The United States SHALL CONDUCT A RE-PROCUREMENT to replace Solicitation No. N00174-03-R-0044, upon a time schedule that will allow the new contract to be awarded with a start date of April 10, 2006, when the current option year of the contract issued under Solicitation No. N00174-03-R-0044 expires.

Id. at 434.

Pursuant to the Court's order, on February 13, 2006, DARPA issued solicitation HR011-06-R-0001 on a full and open competition basis. Dec. at ¶ 1f.[2] Maden and BAI were among the five companies submitting offers. Id. at ¶ 1g.

On March 10, 2006, the Government filed an unopposed motion to amend the Court's November 23, 2005 in BAI's protest. The Court granted the motion on March 15, 2006:

---

[2] "Dec." refers to DARPA's override decision, attached to plaintiff's brief as exhibit A.

> The Court has reviewed defendant's unopposed motion to amend the Court's November 23, 2005 order. That order required the contract awarded under the re-procurement to begin on April 10, 2006. Through its motion, the defendant informed the Court that the April 10, 2006 contract start date will not afford it time to fully evaluate the contract proposals and requests that the Court modify the order to allow the contract to start on or by July 30, 2006. The motion is hereby GRANTED. The United States shall conduct the ordered re-procurement upon a time schedule that will allow the new contract to be awarded with a start date of no later than July 30, 2006.

Order in Beta Analytics (No. 04-556) dated Mar. 15, 2006.

## IV. The Override Decision

DARPA made an award of the new solicitation to BAI on July 19, 2006, with a start date of July 27, 2006. Dec. at ¶ 1i; Pl. Mot. Aug. 7, 2006 in Beta Analytics, No. 04-556. DARPA informed Maden of the award on the same day, and gave Maden a debriefing on July 28, 2006. Pl. Br. Ex. D, at A-13. On July 31, 2006, Maden filed a protest with the Government Accountability Office ("GAO"). Dec. at ¶ 1k.

On August 1, 2006, DARPA issued its decision to override the automatic stay pursuant to 31 U.S.C. § 3553(d)(3)(c)(i)(II). This section provides that "[t]he head of the procuring activity may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section) . . . upon a written finding that . . . (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(c)(i)(II).

DARPA's override decision notes that the Government was required by this Court's previous orders to make a new award under full and open competition by July 31, 2006. Dec. at

1e. Furthermore, the override decision states, "DARPA cannot have the previous contractor, Maden, to continue performance because the [Court of Federal Claims] determined that the award to Maden was arbitrary and capricious." Id. at ¶ 1o. In addition, DARPA indicated that performance by Maden would not be possible absent permission from this Court. Id. DARPA concluded:

> The award to Beta Analytics International, Inc. requires the contractor to be responsible for supplying critical security services to DARPA and in turn to the national security. I determine that urgent and compelling circumstances significantly affecting the interests of the United States will not permit waiting for the decision of the Comptroller General.

Dec. at ¶ 2 (Determination).

**ARGUMENT**

**I. This Court Should Decline To Address Maden's Claims**

This Court should decline to exercise jurisdiction in this case due to the legitimate national security interests in this case. As this Court has previously held,

> where 'legitimate interests of national defense and national security' have been asserted and established to the court's satisfaction, it is 'not necessary' for the court to reach the merits of whether [CICA] was violated 'in connection with a procurement[.]' . . . Instead, [when such interests] are raised and established to the court's satisfaction, the circumstances under which the United States Court of Federal Claims should find it 'necessary' to reach the merits of an override decision should be the exception, not the rule.

Kropp Holdings, Inc. v. United States, 63 Fed. Cl. 537, 549 (2005).

This case clearly implicates national security concerns. DARPA's role is to accelerate technological advances that can be used by our military in defending the country. Many of these advances are currently being used by our forces in Iraq, Afghanistan, and elsewhere.

Furthermore, systems currently under development may provide valuable tools in saving lives and supporting our armed forces in the immediate future. Maden does not contest that the contract at issue in this case calls for critical services required by DARPA for national security. Pl. Br. at 7. Furthermore, this Court recognized that the predecessor contract to the contract with BAI implicated national security concerns. Beta Analytics International, Inc. v. United States, 69 Fed. Cl. 431, 433 (2005). Therefore, pursuant to this Court's decision in Kropp Holdings, this Court should decline to exercise jurisdiction over plaintiff's challenge to DARPA's override of the automatic stay.

## II. In The Alternative, Maden Has Not Demonstrated That DARPA's Decision Was Arbitrary And Capricious

### A. Maden Has The Burden Of Demonstrating That The Agency's Decision Was Arbitrary And Capricious

In a procurement-related challenge, the Court assesses the agency's decision pursuant to the review standard of the Administrative Procedure Act, 5 U.S.C. § 706, as incorporated by the Tucker Act, 28 U.S.C. § 1491(b)(4). RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1291 (Fed. Cir. 1999). Application of the arbitrary and capricious standard involves neither judicial fact finding, nor review of the agency's factual statements for "substantial evidence." See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing Camp v. Pitts, 411 U.S. 138, 140 (1973)). Rather, the Court will sustain an agency decision "evincing rational reasoning and consideration of relevant factors." Id. at 1058 (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285 (1974)). The Court must ask whether there has been "a clear error of judgment," without substituting its own judgment for the agency's. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416

(1971); Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004). This Court should uphold the agency's decision unless the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Even a decision "of less than ideal clarity" may be upheld "if the agency's path may reasonably be discerned." Bowman Transp. Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 286 (1974).

Although this Court's review of an agency decision under the arbitrary and capricious standard is highly deferential, this Court should accord even greater deference due to the respect traditionally accorded the military in protecting our national security. See 28 U.S.C. § 1491(b)(3) (stating that the Court "shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action"); Filtration Development Co, LLC v. United States, 59 Fed. Cl. 658, 662 (2004) (describing "the plethora of authority mandating judicial deference in the area of military affairs").

**B. Maden Has Not Met Its Burden Of Demonstrating That DARPA's Decision Was Arbitrary And Capricious**

**1. DARPA's Decision To Override The Stay Was Reasonable**

Maden does not contest that the contract at issue in this case calls for critical services required by DARPA for national security. Pl. Br. at 7. However, Maden contends that the Government lacked an urgent and compelling basis to continue the award to BAI at the time the Government issued its override decision. Essentially, Maden contends that the Government could have had Maden perform the services, rather than BAI, pending the GAO's decision. Pl.

Br. at 3. Contrary to this assertion, it was reasonable for DARPA to conclude that urgent and compelling circumstances dictated that the Government override the stay of performance by BAI.

The most important facts cited in the override decision are: (1) the award requires the contractor to provide critical security services necessary for DARPA to fulfill its role in protecting our national security; (2) this Court had ordered DARPA to re-procure the contract with a start date of no later than July 30, 2006; and (3) this Court had determined that the award to Maden had been arbitrary and capricious. As to the first point, as stated above, Maden does not contest that the contract at issue in this case calls for critical services required by DARPA for national security. Pl. Br. at 7.

Second, it was reasonable for DARPA to conclude it was obligated by this Court to re-procure the contract with a start date of no later than July 30, 2006. This Court's decision dated November 23, 2005 ordered the Government to conduct a re-procurement "that will allow the new contract to be awarded with a start date of April 10, 2006." Beta Analytics, 69 Fed. Cl. at 434. Furthermore, the Court stated,

> Beta asks that the Court 'direct DARPA to terminate Maden Tech's Contract at the end of the current option year which closes on April 9, 2006, or as soon as the re-procurement is complete, [whichever] occurs last.' Such a direction may be superfluous, as the re-procurement necessarily implies the termination of the existing contract.

Id. at 432.

When the Government concluded in March, 2006 that it could not reasonably meet that time frame, it filed an unopposed motion to extend the start date of that award. In this Court's order granting our motion, this Court described our motion as "request[ing] that the Court

modify the order to allow the contract to start on or by July 30, 2006", and ordered the Government to "conduct the . . . re-procurement upon a time schedule that will allow the new contract to be awarded with a start date of no later than July 30, 2006." Order in Beta Analytics (No. 04-556) dated Mar. 15, 2006 (emphasis added).

Third, this Court's previous decisions clearly indicated that the award to Maden had been arbitrary and capricious. Beta Analytics, 69 Fed. Cl. at 434; Beta Analytics, 67 Fed. Cl. at 408. Based upon these facts, it was reasonable for DARPA to conclude that urgent and compelling circumstances dictated overriding the stay to permit the new award to proceed.

Maden contends that the Government's March, 2006 motion to extend the award to Maden undercuts DARPA's contentions in its override decision. Pl. Br. at 8. Contrary to this assertion, the Government's motion to extend the contract to Maden pending a completion of the re-procurement process does not support Maden's position. The circumstances at the time of DARPA's override decision were significantly different from the circumstances in March, 2006. In March, 2006, the Government did not have a contractor in place to perform the contract other than Maden because of the delay in the re-procurement process. In contrast, by the end of July, 2006, BAI had already started performance of the new contract. Therefore, at the time of the override decision, the Government was no longer obligated by necessity to continue the arbitrary and capricious award to Maden. To the contrary, a fair reading of the Court's prior orders indicated that Maden's performance under its arbitrary and capricious award had to be completed by the end of July, 2006.

Moreover, Maden is the party espousing an unreasonable position, not DARPA. Maden faults the Government for permitting BAI to perform the contract for less than 100 days while

the GAO considers the merits of Maden's protest. Yet, Maden objected to a preliminary injunction preventing Maden from performing the predecessor contract, which this Court found to be the result of an arbitrary and capricious award, pending the Court's decision on the merits. Based upon the arguments presented by Maden and the Government, the Court denied BAI's request for a preliminary injunction, permitting Maden to continue performing the contract for more than one year prior to the Court's decision on the permanent injunction. Furthermore, at the time of the Court's decision on the permanent injunction, the Court and all of the parties, including BAI, agreed that it was necessary to permit Maden to continue performing the contract while the re-procurement took place. Beta Analytics, 69 Fed. Cl. at 432; Order dated Mar. 15, 2006. Thus, Maden was allowed to continue performing the contract for seven months after the Court's decision concluding that the award to Maden was arbitrary and capricious. Maden cannot reasonably contend that it is improper to allow continued performance by BAI for less than 100 days, based merely on allegations that the contract is improper, when in the prior proceeding Maden contended, and this Court agreed, that it was appropriate to allow Maden to continue performing for more than two years after BAI challenged the award to Maden, and approximately seven months after this Court determined that the award to Maden was arbitrary and capricious.

#### 2. This Court's August 8, 2006 Order In The Beta Analytics Case Does Not Assist Maden

Maden contends that an order issued by this Court on August 8, 2006 in Beta Analytics undermines DARPA's override decision. Pl. Br. at 2. Contrary to Maden's contention, the August 8, 2006 order is irrelevant to the validity of DARPA's decision. This Court must evaluate the reasonableness of the agency's decision at the time the agency made its decision.

See Campbell v. Dep't of Justice, 164 F.3d 20, 29 (D.C. Cir. 1998) ("The court must evaluate the agency's decision under the executive order in force at the time the classification was made."); Newton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 808 (8th Cir. 1998) ("[I]f the agency's decision was proper at the time it was made, our inquiry is at an end."). Therefore, this Court's August 8, 2006 order, issued more than a week after the override decision, is irrelevant.

In any event, even if this order were relevant to the override decision, the order does not assist Maden. In the August 8, 2006 order, issued in response to a motion by Maden, the Court "clarified" its prior orders to indicate that it was not necessary for the Government to seek the Court's permission to further extend the contract with Maden. Order at 2. However, the fact that Maden felt it was necessary to seek clarification of the Court's prior orders, and that the Court likewise found it necessary to clarify its prior orders, vindicate DARPA's statement in the override decision that Court intervention would be necessary to permit further performance by Maden, even assuming that such performance under the former contract was possible and appropriate.

Furthermore, this Court's August 8, 2006 order casts strong doubt on whether it would have been appropriate for Maden to continue performance pending the GAO's decision:

> After all, the automatic stay would allow Maden Tech's contract, arbitrarily awarded in the first place, to be extended during the pendency of the GAO proceedings, so that plaintiff may be prevented from performing the new contract. In other words, just because the second award *might* have been arbitrary, Maden Tech seeks to benefit further from a previous award that *was* arbitrary. Considering that Beta Analytics was the incumbent under the contract that ended with the arbitrary award to Maden Tech, from [BAI]'s perspective this result would assuredly add insult to injury, if not additional injury. . . . While DARPA may have had no choice but to allow Maden Tech to continue its performance while the re-procurement was proceeding, the completion of the re-

> procurement has identified another contractor that can displace one whose status was arbitrarily created.

Order in Beta Analytics at 2.

**III. Even If Maden Could Show That DARPA's Decision Was Arbitrary And Capricious, Maden Is Not Entitled To The Relief It Requests**

**A. Maden Must Demonstrate Several Factors In Order To Obtain A Temporary Restraining Order Or An Injunction**

To obtain a temporary restraining order or a preliminary injunction, plaintiff must demonstrate the following: (1) a substantial likelihood exists that the moving party will prevail on the merits; (2) it will suffer irreparable injury unless the temporary restraining order issues; (3) the threatened injury to the moving party outweighs any damage to the opposing party; and (4) the temporary restraining order, if issued, will not be adverse to the public interest. OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001); Cincom Sys., Inc. v. United States, 37 Fed. Cl. 266, 268 (1997). A temporary restraining order or a preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis added); accord CSE Constr. Co., Inc. v. United States, 58 Fed. Cl. 230, 261 (2003); EDP Enter., Inc. v. United States, 56 Fed. Cl. 498, 500 (2003); Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381 (1997). The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires success on the merits. CSE Constr., 58 Fed. Cl. at 262.

The decision on whether to grant any relief is within the sound discretion of the trial court. CSE Constr., 58 Fed. Cl. at 261. Even if a plaintiff protest prevails as to the merits by

demonstrating that the agency's decision is arbitrary and capricious, the Court need not grant any relief to the plaintiff based upon the remaining three factors for injunctive relief. PGBA, LLC v. United States, 389 F.3d 1219, 1227-32 (Fed. Cir. 2004) (affirming the Court of Federal Claims' decision not to grant any relief to plaintiff, including declaratory relief, despite a showing that the agency's decision was arbitrary and capricious).

**B. Maden Has Failed To Demonstrate That It Is Entitled To A Temporary Restraining Order Or Injunctive Relief Based Upon The Four Factors**

Of the four factors that must be weighed when evaluating the appropriateness of a temporary restraining order or an injunction, plaintiff's complaint and brief fail to address three of these factors: (a) irreparable harm; (b) the balancing of the harms; and (c) the public interest. Having failed to address these three factors in its complaint and brief or allege facts related to these factors, plaintiff is barred from raising these issues in its reply brief or at hearing. Furthermore, because plaintiff has not even attempted to argue that three of these factors support its claims, this Court should deny Maden's request for a temporary restraining order and an injunction.

Even if Maden were not barred from addressing these issues in its reply brief, Maden's decision not even to attempt an argument with respect to three of the four factors is telling. For example, Maden has not alleged any irreparable harm because it cannot demonstrate any irreparable harm. Likewise, the balancing of the harms and the public interest clearly weigh against a temporary restraining order and injunction.

### 1. Maden Has Not Demonstrated A Likelihood Of Success On The Merits

As to the only factor addressed by Maden in its complaint or brief, as demonstrated above, Maden has not shown that the Government's override decision was arbitrary and capricious. Rather, DARPA acted reasonably in issuing the override to enable BAI to continue performance of the contract pending a decision at the GAO. It was hardly unreasonable for DARPA to take steps to ensure the continued delivery of services by BAI for less than 100 days when Maden was given more than two years to continue performance of a contract that this Court found was improperly awarded.

### 2. Maden Has Not Identified Any Irreparable Harm

Maden has not alleged that it will suffer any irreparable harm absent the issuance of a temporary restraining order or injunction, and Maden will not suffer any irreparable harm during the period remaining prior to the GAO's decision. It should be emphasized that plaintiff's suit in this Court addresses only the Government's override of the stay pending the GAO's decision. Therefore, plaintiff must demonstrate that it will suffer irreparable harm during the less than 100 days remaining prior to the GAO's decision. Maden cannot demonstrate that there is likely to be any irreparable harm during this period.

Loss of revenue during this time period does not constitute irreparable harm. See Bannum Inc., v. United States, 56 Fed. Cl. 453, 456 (Fed. Cl. 2003). "Economic harm, without more, does not seem to rise to the level of irreparable injury." Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997). "Only in extraordinary circumstances, such as the prospect of insolvency or an inability to collect damages, will monetary damages alone give rise

to irreparable harm." Bannum, 38 Fed. Cl. at 456; accord Wright & Miller, 11A Fed. Prac. & Proc. Civ.2d § 2948.1.

Furthermore, while protestors often allege irreparable harm based upon an alleged competitive advantage that may be gained by the awardee leading up to the GAO's decision, any such allegation in this case would be misplaced given that both Maden and BAI performed the services called for in this contract prior to the award to BAI in 2006. It is hard to imagine that BAI might learn anything in the next 100 days that it did not already know by performing under a predecessor contract for nearly four years. See Beta Analytics Intern., Inc. v. United States, 69 Fed. Cl. 431, 433 (2005) (stating that "[a]s to the matter of incumbency generally, it is really not the status, but the experience, that is beneficial in a properly-conducted competitive procurement process;" and noting that at that point Maden had nineteen months of experience, "whether or nor it should have gained this experience," and BAI had nearly four years' worth of experience under the predecessor contract).

Any claim by Maden that it will suffer irreparable harm would also be undermined by Maden's own assertions to the Court in Beta Analytics. In Beta Analytics, Maden opposed BAI's request for a preliminary injunction pending the Court's evaluation of the merits of BAI's protest. App. A. In its opposition, Maden indicated that BAI would suffer no irreparable harm while Maden continued to perform the contract. App. A, at 13-15. Now the positions are reversed, with the only difference being that it will be the GAO deciding the merits of the protest, not this Court. Maden can hardly contend that it will suffer irreparable harm prior to the GAO's decision addressing the merits of Maden's protest, less than 100 days from now, when

Maden did not believe that BAI would suffer irreparable for more than a year prior to this Court's decision on the merits of BAI's protest.

### 3. The Balancing Of The Harms Weighs In Favor Of The Government

The Government would be significantly harmed in the event that the stay were to go into effect. Contrary to Maden's assertion, Pl. Br. at 8, DARPA cannot extend at this time the previous contract to Maden. That contract expired on July 31, 2006. App. B. Furthermore, as BAI is likely to address in more detail in its brief, many of Maden's former employees have already taken positions at BAI. As a result, if the stay were to go into effect, the Government would have to conduct an expedited re-procurement for a bridge contract pending the GAO's decision. During this interval between the commencement of the stay and the start of the bridge contract, the Security Intelligence Directorate would not be able to perform vital functions that must be performed in order to protect the security of DARPA's information, processes, and programs. App. B.

Furthermore, even if Maden had identified some irreparable harm, as Maden recognized when its role with BAI was reversed, the potential harm to the company to be displaced must also be considered:

> [This] Court has recognized that: "'[R]elief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents.'" *Alaska Cent. Express, Inc. v. United States*, 51 Fed. Cl. 227, 232 (2001) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

App. A at 16.

**4. The Public Interest Weighs In Favor Of The Government**

The public interest strongly weighs in favor of the Government. The public has an interest in ensuring that the military is able to carry out its mission, and that our armed forces are best equipped to address the threats faced by this nation. DARPA plays a vital role in protecting our national security, and the services provided under the contract are necessary for DARPA to fulfill that role. Any disruption to these services would significantly harm DARPA and, in turn, adversely affect our national security.

Furthermore, the underlying purpose of the CICA stay does not support the issuance of injunctive relief. As this Court has described the purpose of the CICA stay,

> the basic reason for the CICA provision halting contract performance on the filing of a protest with the GAO is to ensure agency consideration of the ensuing GAO decision. In certain situations, a stay is necessary to prevent the contract from being completely fulfilled such that there is no need for a recompetition. In the usual situation where a contract is for the purchase of items or the construction of a building, continued performance during the protest period could produce a fait accompli, in that substantial performance would render any subsequent GAO recommendation for resolicitation impractical to carry out.

Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573, 584 (2003).

As this Court noted in Sierra, the risk of a fait accompli typically arises in the context of a construction contract or purchase contract, in which the awardee's performance of the contract pending the GAO's decision may lead the agency to conclude that a resolicitation of the contract is impractical or inadvisable. Id. For example, if the contract calls for the production of certain items, and the awardee is likely to make significant progress in the production of these items prior to the GAO's decision, a reprocurement of the contract could result in substantial waste because the work performed prior to the GAO's decision in partial performance of the contract

could not be utilized by the new contractor. There is little or no such risk with typical service contracts like the contract at issue in this case.

Lastly, even if it were possible at this time to reinstate Maden's expired contract, the public interest is not served by permitting continued performance under a contract that has already been determined by this Court to be arbitrary and capricious, when "the completion of the re-procurement has identified another contractor that can displace one whose status was arbitrarily created." Order dated August 8, 2006, in Beta Analytics, No. 04-556.

### C. Maden's Attempt To Avoid Demonstrating The Injunctive Factors Is Unavailing

Because Maden cannot prevail in an analysis of the four injunctive factors, Maden suggests that this Court need not consider the injunctive factors. Pl. Br. at 5. To the extent that Maden suggests that this Court could issue a temporary restraining order or an injunction without an evaluation of all four factors, Maden's suggestion is incorrect and contrary to well established precedent. See, e.g., CSE Constr., 58 Fed. Cl. at 262; OAO Corp., 49 Fed. Cl. at 480; Cincom Sys., Inc., 37 Fed. Cl. at 268. Furthermore, none of the cases cited by Maden hold that the Court can grant a temporary restraining order or injunction without a demonstration by the plaintiff that these extraordinary and drastic remedies should be granted based upon an analysis of the four factors.

In addition, while declaratory relief typically does not require an analysis of the four injunctive factors, when declaratory relief would have the same effect as an injunction, the Court should evaluate plaintiff's request for relief as if plaintiff had requested injunctive relief alone. PGBA, LLC v. United States, 389 F.3d 1219, 1227-28 (Fed. Cir. 2004). In PGBA, this Court denied declaratory and injunctive relief to the plaintiff in a bid protest, despite a finding by this

Court that the Government's actions were arbitrary and capricious. Id. at 1232-33. The plaintiff in PGBA requested declaratory relief, however, this Court found that the declaratory relief would be tantamount to an injunction, and, therefore, this Court applied the four injunctive factors in determining the appropriateness of both declaratory relief or an injunction. Id. at 1227-28. After evaluating these factors, this Court denied declaratory and injunctive relief. Id. at 1223.

In affirming this Court's decision, the Federal Circuit concluded that when declaratory relief would be tantamount to injunctive relief, the plaintiff's request for relief should be treated as if plaintiff had requested injunctive relief alone. Id. at 1227-28. Therefore, analysis of the four factors for injunctive relief was appropriate. Id.

## CONCLUSION

For the reasons stated above, we respectfully request that the Court decline to address Maden's claims and dismiss its suit. In the alternative, if the Court addresses Maden's claims, we respectfully request that the Court deny Maden's request for a temporary restraining order, preliminary injunction, permanent injunction, and declaratory relief. In addition, we ask that the Court grant judgment upon the administrative record in favor of the Government.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

/s/ Michael J. Dierberg
MICHAEL J. DIERBERG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St. NW
Washington, DC 20530
Telephone: (202) 353-0536
Facsimile: (202) 305-7643

August 22, 2006

Attorneys for Defendant