# Appendix

TABLE OF CONTENTS

Override decision dated Aug. 1, 2006 . . . . . . . . . . 1

Order in Beta Analytics, Fed. Cl. No. 04-556, dated Aug. 8, 2006 . . . . . . . . . . 5

Override decision dated Aug. 28, 2006 . . . . . . . . . . 8

Order dated Aug. 28, 2006 . . . . . . . . . . 17

Complaint in Maden Tech Consulting v. United States, Fed. Cl. No. 06-612, filed Aug. 31, 2006 . . . . . . . . . . 19

GAO decision on Maden's protest dated Oct. 30, 2006 . . . . . . . . . . 30

**DEFENSE ADVANCED RESEACH PROJECTS AGENCY**
**3701 NORTH FAIRFAX DRIVE**
**ARLINGTON, VA 22203-1714**

T. Michael Guiffre
Patton Boggs, LLP
Attorneys at Law
2550 M Street, NW
Washington, DC 20037-1350

AUG 1 2006

FAX: 202-457-6315

RE: GAO Protests of STG Incorporated (STG) and Maden Technologies Incorporated (Maden), under Solicitation HR0011-06-R-0001, GAO File No. **B-29854.1** and **B-298543.2**

Dear Mr. Guiffre:

Enclosed please find the Determination and Finding regarding DARPA's override of the stay requirement pursuant to 31 U.S.C. Sec. 3553(d)(3)(c)(II) and Federal Acquisition Regulation (FAR) 33.104(c)(2)(ii).

If you have any questions regarding this matter please contact me at (571) 218-4409.

Sincerely,

Mary E. Clarke
Assistant General Counsel
DARPA

# DETERMINATION AND FINDING

**SUBJECT:** Override of Stay Requirement, GAO Protests of STG, Incorporated (STG) and Maden Technologies Incorporated (Maden), Against Contract HR0011-06-C-0127, GAO File No. B-29854.1 and B-298543.2

This Determination and Findings is made pursuant to 31 U.S.C. Sec. 3553(d)(3)(c)(II) and Federal Acquisition Regulation (FAR) 33.104(c)(2)(ii).

**FINDINGS**

1. The relevant facts are as follows:

a. The Defense Advanced Research Projects Agency (DARPA) is the requiring activity. DARPA needs support services in developing, implementing and maintaining programs that facilitate the secure and successful accomplishments of its mission while protecting DARPA.

b. The mission of DARPA is to serve as the central research and development organization of the Department of Defense with a primary responsibility to maintain U.S. technological superiority over potential adversaries. DARPA is responsible for many secret and top secret programs.

c. DARPA is responsible for:

Arranging for the performance of, and supervising the work connected with, DARPA projects assigned to the Military Departments, other U.S. Government activities, individuals, private business entities, educational institutions, or research institutions, giving consideration to the primary functions of the Military Departments.

Engaging in assigned advanced research projects.
32 CFR Part § 358.4 (d) (e)

d. DARPA's Office of Management Operations(OMO)/Security and Intelligence Directorate (SID) supports this mission by planning, executing, and directing the information, personnel, industrial, information assurance, and physical security programs at DARPA headquarters and at specified contractor sites. This includes Sensitive Compartmented Information (SCI), Special Access Programs (SAP), and classification management activities. OMO/SID also formulates and implements security policy and procedures at DARPA and represents DARPA on security matters with external organizations. In fulfilling this responsibility, OMO/SID desires support services in developing, implementing and maintaining programs that facilitate the secure and successful accomplishments of its mission

while protecting DARPA personnel, information and property, and that are consistent with DARPA Mission, Public Law, National Policy, applicable Executive Orders, and Department of Defense Directives and Regulations. These support services are the requirements of subject solicitation and contract.

e. On the previous award for these services Beta Analytics International, Inc., (BETA) protested the award that was made to Maden Technologies Consulting, Inc. On November 23, 2005, the Court enjoined DARPA from exercising further options with the incumbent. The performance under the current option expired on March 31, 2006. By way of an additional Order, the Court gave DARPA until July 31,2006 to make a new award under full and open competition.

f. Pursuant to the Court Order on February 13, 2006 DARPA issued solicitation HR011-06-R-0001 on a full and open competition basis.

g. There were 5 offers received in response to the solicitation.

h. Negotiations were held with three of the offerors, STG, Maden, and BETA.

i. An award, HR0011-06-C-0127, was made to BETA on July 19, 2006 for $12,013,757.00

j. On July 28, 2006 STG filed a protest with GAO. STG received a debriefing on the award on July 26, 2006.

k. On July 31, 2006, Maden filed a protest with the GAO. Maden received a debriefing on the award on July 28, 2006.

l. Both protests were filed within 5 days after unsuccessful offeror received a debriefing from the contracting officer.

m. Pursuant to 31 U.S.C. Sec. 3553(d)(3)(A)(ii), the contracting officer is required to direct the contractor to cease performance upon receipt of a notice of protest within 5 days after a debriefing.

n. A decision on the protest is not due from the GAO until November 8, 2006. This contract cannot be delayed pending the disposition of the protest. (See paragraphs "a" through paragraph "d" above).

o. In addition, DARPA cannot have the previous contractor, Maden, to continue performance because the Federal Court of Claims determined that the award to Maden was arbitrary and capricious. To ask Maden to continue performance would not be in the best interest of the Government and would endanger the integrity of the procurement system by continuing an award the court has determined unlawful. In addition, if DARPA wanted to continue the performance by Maden, permission from the Federal Court of Claims would be required.

DARPA could not fulfill its mission while waiting for the Court to rule on such a motion.

p. 31 U.S.C. Sec. 3553(c), as implemented by FAR 33.104(c), provides that the head of the contracting activity may authorize contract performance notwithstanding the protest, upon a written finding that urgent and compelling circumstances that significantly affect the interests of the United States will not permit waiting for the GAO's decision.

## DETERMINATION

The award to Beta Analytics International, Inc. requires the contractor to be responsible for supplying critical security services to DARPA and in turn to the national security. I determine that urgent and compelling circumstances significantly affecting the interests of the United States will not permit waiting for the decision of the Comptroller General.

WILLIAM LEHR
Acting Director
DARPA

# In the United States Court of Federal Claims

NOT FOR PUBLICATION
No. 04-556C
(Filed August 8, 2006)

FILED
AUG 8 2006
U.S. COURT OF FEDERAL CLAIMS

* * * * * * * * * * * * * * * * * * * * * * * * *

**BETA ANALYTICS INTERNATIONAL, INC.,**

Plaintiff,

v.

**THE UNITED STATES,**

Defendant,

and

**MADEN TECH CONSULTING, INC.,**

Intervenor.

* * * * * * * * * * * * * * * * * * * * * * * * *

**ORDER**

The Court has received a copy, by facsimile, of "Intervenor's Emergency Motion for Declaratory Judgment to Reinstate the Automatic Stay in Intervenor's GAO Protest, and for Leave to Amend this Court's Order o[f] March 15, 2006." In previous orders, this Court determined that the award of a contract to Maden Tech was arbitrary, *see Beta Analytics Int'l v. United States*, 67 Fed. Cl. 384 (2005), and that the appropriate remedy was a re-procurement and an injunction preventing the government from exercising any more options on intervenor's contract. *Beta Analytics Int'l v. United States*, 69 Fed. Cl. 431, 434-35 (2005) ("*Beta II*"). Since the current option year was to end on April 9, 2006, the Court ordered that the re-procurement be conducted "upon a time schedule that will allow the new contract to be awarded with a start date of April 10, 2006." *Id.*

When this schedule proved infeasible, the Court granted defendant's unopposed motion to extend the re-procurement period for an additional 120 days, so that defendant was required to "conduct the ordered re-procurement upon a time schedule that will allow the new contract to be awarded with a start date of no later than July 30, 2006." Order, March 15, 2006. According to Maden Tech a new contract was awarded to plaintiff, as a result of the re-procurement, with a

start date of July 27, 2006. Mem. in Supp. Emerg. Mot. at 3. Thus, the government has satisfied the Court's March 15, 2006 order.

Maden Tech and another unsuccessful bidder, STG, Inc., apparently filed timely protests of this new award with the Government Accountability Office. *Id.* at 3-4. The Defense Advanced Research Projects Agency ("DARPA") issued a Determination and Finding that "urgent and compelling circumstances significantly affecting the interests of the United States will not permit waiting for the decision of the Comptroller General," and thus the automatic stay was overridden pursuant to 31 U.S.C. § 3553(d)(3)(c)(II). Ex. A to Emerg. Mot (Determ. & Finding at 3). Because the determination was based, in part, on DARPA's construction of the Court's previous orders to require this Court's permission "to continue the performance by Maden," *id.* (Determ. & Finding at 2, ¶ o), intervenor seeks this Court's review of the override decision or, in the alternative, an amendment or clarification concerning the government's obligations under the prior orders.

Although the re-procurement is part of the Court-ordered remedy redressing the arbitrary award of the contract to Maden Tech, this did not convert the Court into a superintendent of the process. This role was rejected, as improper, by the Court in *Beta II*, 69 Fed. Cl. at 432, even with regard to the rights of the injured party in this case -- as the Court explained that plaintiff "can enforce its rights in a *separate*, pre-award challenge." *Id.* at 434. The re-procurement process was a new matter, from which new controversies may pose the subject matter of a new case. But neither did the Court intend its orders concerning the re-procurement to interfere with or complicate any protests concerning the re-procurement. In enjoining the government from "exercising another option *year*," *id.* (emphasis added), the Court did not intend to prevent the government, if it felt it were necessary, from making any short-term extensions of the Maden Tech contract to facilitate the bid protest process. To that extent, intervenor's motion is **GRANTED**, and the prior orders are clarified.

But while the Court's prior orders should not be viewed as forbidding a short-term extension, they also should not be read to encourage one. The Court takes no position on whether the circumstances are "urgent and compelling," warranting an override of the automatic stay. After all, the automatic stay would allow Maden Tech's contract, arbitrarily awarded in the first place, to be extended during the pendency of the GAO proceedings, so that plaintiff may be prevented from performing the new contract. In other words, just because the second award *might* have been arbitrary, Maden Tech seeks to benefit further from a previous award that *was* arbitrary. Considering that Beta Analytics was the incumbent under the contract that ended with the arbitrary award to Maden Tech, from plaintiff's perspective this result would assuredly add insult to injury, if not additional injury. And as the proceedings of this case have demonstrated, the beginning of performance under a contract does not preclude the possibility that a well-founded protest may succeed. While DARPA may have had no choice but to allow Maden Tech to continue its performance while the re-procurement was proceeding, the completion of the re-procurement has identified another contractor that can displace one whose status was arbitrarily created.

But this case is not the proper vehicle for the override decision to be reviewed. The re-procurement might have been the result of the above-captioned case, but was not its subject, and the Court finds that it is without jurisdiction to rule on the DARPA override. Either Maden Tech or STG may, of course, file a new case in our Court challenging the override, to be assigned randomly to another judge of our Court. This Court's order should not be read as affecting their abilities to do so. The motion to declare the override invalid and to set it aside is, accordingly, **DENIED** without prejudice.

**IT IS SO ORDERED.**

**VICTOR J. WOLSKI**
Judge

DEFENSE ADVANCED RESEACH PROJECTS AGENCY
3701 NORTH FAIRFAX DRIVE
ARLINGTON, VA 22203-1714

AUG 28 2006

**SUBJECT:** Override of Stay Requirement, GAO Protests of STG, Incorporated (STG) and Maden Technologies Incorporated (Maden), Against Contract HR0011-06-C-0127, GAO File No. B-29854.1 and B-298543.2

This Determination and Findings is made pursuant to 31 U.S.C. Sec. 3553(d)(3)(c)(II) and Federal Acquisition Regulation (FAR) 33.104(c)(2)(ii).

**FINDINGS**

1. The relevant facts are as follows:

   a. The Defense Advanced Research Projects Agency (DARPA) is the requiring activity.

   b. DARPA issued solicitation HR0011-06-C-0127 on February 13, 2006 for the procurement of contractor support services for the Security and Intelligence Directorate (SID), which is under the Office of Management Operations (OMO), at the Defense Advanced Research Projects Agency.

   c. DARPA is a military research organization within the Department of Defense, whose mission is to prevent technological surprise to the United States, and to create technological surprise for our enemies.

   d. As described by DARPA's strategic plan, DARPA's goal is to "bridge the gap" between fundamental discoveries, where new science and new concepts typically surface, and more near-term improvements and solutions to known systems and problems.

   e. DARPA is designed to be a technological engine in the acceleration of advances that will assist our military and protect our national security. As described by DARPA's strategic plan:

      > DARPA's strategy for accomplishing its mission is embodied in strategic thrusts. . . . Today there are eight strategic thrusts . . . that are important national security research and development areas. They represent focus areas for DARPA involvement and contain the foundations for innovative joint warfighting

capabilities to defeat existing and emerging national security threats.

f. The current strategic thrusts are: (1) detection, precision ID, tracking, and destruction of elusive targets; (2) robust, secure self-forming tactical networks; (3) networked manned and unmanned systems; (4) urban area operations; (5) detection, characterization, and assessment of underground structures; (6) assured use of space; (7) cognitive computing; and (8) bio-revolution.

g. Many of DARPA's programs have led to innovations currently being utilized in our operations in Iraq and elsewhere. For example, after consultation with Marine Corps officials, DARPA assembled a quick-reaction program designed to develop a system capable of determining the direction from which shots are fired at a moving vehicle. This led to the development of the Boomerang shooter detection system, currently deployed in Iraq.

h. In addition, several of DARPA's strategic thrusts are directed at addressing the specific type of challenges currently facing our armed services in Iraq and Afghanistan.

i. DARPA is responsible for arranging for the performance of, and supervising the work connected with, DARPA projects assigned to the Military Departments, other U.S. Government activities, individuals, private business entities, and educational or research institutions, giving consideration to the primary functions of the Military Departments.

j. The contract, in this case, calls for the provision of services to DARPA's Security and Intelligence Directorate. The Security and Intelligence Directorate is responsible for ensuring the security of DARPA information and programs. SID has an enormous responsibility within DARPA. DARPA has approximately 120 ongoing Special Access Programs (SAP). These SAPs are spread over 320 different facilities, with over 400 users (companies, organizations, academic institutions, agencies, etc.) performing work related to SAP programs at one of these facilities.

k. The information generated or exchanged by DARPA and the 400 users connected to SAPs must be protected from improper disclosure at every step of the process. This requires, among other things:

   i) Personnel security clearances. Each individual associated with a classified program cannot perform any work on the program unless they have the appropriate clearance. Eight (8) FTEs are required to perform

personnel security functions associated with gaining, maintaining, and updating personnel security clearances for agency and performer personnel. This includes dedicated personnel security (PERSEC) man-hours and leveraged program security representative (PSR) man-hours.

ii) Facility security clearances. A company cannot perform classified work unless the company has the appropriate security clearance. Eight (8) FTE man-years are required to perform facility security clearance validation and ensure facilities meet required physical security standards. This includes leveraged PSR man-hours.

iii) Passing, certifying and verifying clearances. When a person travels from their home organization to a host organization to conduct classified work, DoD requires that the home organization certify the individual's clearance to the host organization. The host organization must verify the clearance when the visitor arrives at their location. Unless these processes take place, the work cannot be lawfully conducted. In CY 2005, 13,200 visitors conducted 41,218 visits to DARPA. These functions are performed under the BAI contract. Ten (10) FTE man-years are required to pass, certify, and verify clearances for collateral and SAP. This includes dedicated PERSEC man-hours, security admin, and leveraged PSR man-hours.

iv) Letting of contracts. Letting a classified contract requires that the government specify security requirements in the contractual documents. This is accomplished through the use of the DD Form 254, Contract Security Classification Specification. The DD Form 254 is drafted specific towards the work to be done on the contract, and the inclusion of specific clauses in the contractual document. Without these efforts, the classified work cannot be performed. Sixteen (16) FTE man-years are required to securely let contracts. This includes dedicated PERSEC, Industrial security, and leveraged PSR man-hours.

v) Classification of material. A determination must be made as to what security levels (top secret, secret, or confidential) and to what accesses (SAP or Sensitive Compartmented Information) are appropriate for the information or material associated with classified work. Each specific piece of the work must be examined for the appropriate classification and access level. For example, it may be necessary to declare the overall effort related to the development of a new system as an unacknowledged SAP at the Top Secret level. However, some material that is necessary to build the system should not be classified, but the association of the material with its intended use and the program should be at the secret SAP level. This evaluation must be repeated with each element of the program and at each

phase of the work (concept, concept development, test, demonstration, production, deployment). Twelve (12) FTE man-years are required to classify material. This includes dedicated classification management, Industrial security, security admin, and leveraged PSR man-hours.

vi) *Appropriate public disclosure of information.* DARPA, as with any other research entity, thrives on the exchange of information with a broad spectrum of society, both national and international. The idea is to find good ideas wherever they are, prove they work via accelerated research, and to put them to practical use in the hands of our military to preserve technological superiority and save lives. However, the sharing of information must be carefully controlled to prevent the inadvertent disclosure of classified information and to conform to DoD policy and other restrictions. Six (6) FTE man-years are required to manage the appropriate public disclosure of information. This includes dedicated Industrial security, security admin, and leveraged PSR man-hours.

vii) Handling and accountability of classified materials. Classified documents must be handled, accounted for, and safeguarded to prevent the unauthorized disclosure of the classified information contained in the documents. For example, a classified document may need to be shipped to a contractor, which means that it must be properly marked, packaged (wrapped) and mailed to an authorized location via an authorized means. How it is shipped depends on whether or not it is collateral, SAP, or SCI. In addition, the document must be removed from the sending organization's books and receipt by the receiving organization, must be determined by the sending organization to assure that it was delivered to the correct location. Eight (8) FTE man-years are required to manage the proper handling and accountability of classified information. This includes dedicated classification management, Industrial security, security administration, and leveraged PSR man-hours.

viii) Information Assurance. DARPA, like many other federal and state agencies and private individuals, are under daily attack through cyberspace. These threats constantly evolve and DARPA must be able to thwart these attacks to ensure the protection of DARPA's systems and information. Further, various statutes and acts require that DARPA conduct due diligence of its systems (e.g., Federal Information Security Management Act (FISMA). Seven (7) FTE man-years are required to manage the information assurance requirements for classified and unclassified processing. This includes dedicated information assurance and leveraged PSR man-hours.

ix) Certification and accreditation. To assure that information is adequately protected, DoD requires that certain standards be used for the storage and processing of classified information. The process that is used to assure that facilities and computing systems meet these standards is referred to as Certification and Accreditation. Briefly stated, the certifying official verifies that a facility or computer system is ready for accreditation and the accrediting official verifies the validity of the certification and accredits the system or facility, by, in the case of a computer system, issuing an Authority to Operate (ATO). Without the ATO, information cannot be introduced into or maintained in the facility or introduced or maintained on a computer system; consequently, the technicians cannot do their work. Seven (7) FTE man-years are required to manage the information assurance requirements for classified and unclassified processing. This includes dedicated information assurance and leveraged PSR man-hours.

x) Identification of personnel. There are various identification cards or badges used as a visual and/or electronic aid to facilitate a person's identification and access to a facility or computer system or both. These range from the DoD-Wide Common Access Card (CAC), which allows a person to log onto a computer, to send digitally signed and encrypted email, and to gain access to facilities within the National Capitol Region; to a Courier Card, which authorizes a person to receive and carry classified material; to the DARPA identification badge, which identifies the person to DARPA security guards, indicates the person's security clearance level, and provides electronic access to and within the DARPA facility. SID and the contract awardee ensure that these access cards are properly issued and maintained. Three (3) FTE man-years are required to manage the identification of personnel. This includes dedicated information assurance and leveraged PSR man-hours.

As shown above, it takes all twelve government employees to oversee/execute and 69 contractors at a minimum to perform the comprehensive nature of security support for the Agency as articulated in the SOW of the solicitation. The best estimate shows that the total of eighty-five (85) man-years is needed.

I. SID is thinly staffed, with approximately a dozen employees. Consequently, SID relies heavily upon the contractor to perform the security services described above. The contract requires approximately 69 full time equivalents ("FTEs"), to perform a variety of the services described above, necessary to fulfill SID and DARPA's mission. Per the contract, all of these individuals are required to possess a top secret security clearance.

m. Many of the individuals provided under the contract are embedded within specific DARPA technical offices. For example, of the 69 FTEs to be provided by the contractor, approximately 27 are program security representatives. While embedded within a particular technical office, these representatives provide a wide range of the services described above for the specific programs to which they are assigned.

n. The security requirements fulfilled by the subject contract are not just good practices; they are mandated by statute, regulation, executive orders, and Department of Defense ("DoD") Directives. This governing law is identified in the statement of work of the solicitation. Some of these Directives are: 1) Department of Defense Instruction (DoDI) 0-5205-11, relating to Management, Administration, and Oversight of DoD Special Access Programs (SAPS); 2) DoDD 5205.07, Directive relating to sensitive compartmented information ("SCI"); 3) DoD 5200.1-R, relating to Information Security Program; 4) DCID 6/3 Manual, relating to Protecting Sensitive Compartmented Information Within Information Systems; 5) DCID 6/9—Manual relating to physical security standards for SCI; and 6) Executive Order 12356 - National Security Information., which prescribes a uniform system for classifying, declassifying, and safeguarding national security information. DARPA cannot continue to operate without adhering to these governing laws. DARPA is involved in over 1500 classified programs, which involves information that must be protected through appropriate classification.

o. As indicated above, these services are critical in order for DARPA to perform its mission and to protest classified information from being leaked, which would endanger National Security.

p. Without these services, DARPA's effectiveness would be substantially diminished and 90% of DARPA's work on classified information would have to cease. This would cause serious harm to DARPA and National Security by delaying work on projects that are, in both the immediate and long-term future assist our military in defending this country. Areas were such effects would be immediate, involve the programs for the detection, tracking, and destruction of elusive targets and the programs for detection of underground structures. In addition, there would be a great deal of fiscal and personnel waste. Government and contractor employees could not work on classified projects. The Government would be responsible for the cost incurred under our contracts, even though work would be curtailed. Ninety-nine percent of our contracts are cost-type contracts and DARPA would be responsible for the payment of the contractor's research if they could not continue to work as a result of our lack of required security protocols.

q. DARPA has the following options available:

1) Perform the work in-house with its current staff without the use of the override pursuant to 31 U.S.C. Sec. 3553(d)(3)(c)(II) and Federal Acquisition Regulation (FAR) 33.104(c)(2)(ii). This option is not feasible. The current Government employees on staff in SID perform inherently Governmental functions and oversee the work of the 69 FTEs required under the contract. As paragraph k above indicates, approximately 85 FTEs are required for this work. There are an insufficient number of employees available to perform all of the services required. There are only 234 Government employees at DARPA and these employees perform vital functions. If employees from other departments or offices were to be used to perform these services, the work of these offices would greatly diminish. To detail other employees to perform the services required under the contract would prevent or greatly curtail the research and contracting work performed at DARPA. As described above, these contractors are employed to advance the work of the military, especially those deployed in Iraq and Afghanistan. Also, the Government personnel at DARPA are not specifically trained for the tasks under the contract. The Government employees are mostly scientist, researchers and have not been trained to perform such functions as passing, certifying and verifying clearances.

2) Perform the work in-house by hiring additional staff without the use of the override pursuant to 31 U.S.C. Sec. 3553(d)(3)(c)(II) and Federal Acquisition Regulation (FAR) 33.104(c)(2)(ii). This option is not feasible and probably not lawful. Because of the time that would be required for the Government to hire an additional 69 employees, this is not a feasible option. During the hiring process, DARPA's vital services would be curtailed, as described in the proceeding paragraph, which also makes this an non-feasible option. It is unlawful as referenced in the Federal Activities Inventory Reform Act of 1998. 31 USC 501 prohibits the Federal Government from competing with private industry for non-inherently Governmental services.

3) To conduct a mini competition for the services pending the GAO decision in November. This option is also not feasible. Such a procurement would take more time than that of waiting for the GAO decision. DARPA would be without the services of the contract and its mission would be greatly curtailed, as explained in paragraph 1 above.

4) Award an interim contract to Maden Technologies Consulting, Inc. (Maden). This option is feasible. A protest by Maden was filed on July 31, 2006. Maden was the incumbent contractor. July 31, 2006 was the last day of performance under Maden's contract. The contract did not have an

option to extend services beyond that date. Even if this contract had a option clause that allowed for a continuation of the contract, more than 50% of Maden's employees are now working for Beta Analytics International, Inc., (BAI) under its current contract. Thus, Maden does not currently have the required 69 FTEs who performed under that contract nor does it have the 69 FTEs that were offered under solicitation HR0011-06-C-0127. Additional time would be required for Maden to obtain the required personnel to perform the needed services. Even if it were possible to somehow extend services with Maden pending the GAO's decision and even if Maden could provide those services immediately, I do not believe it would be appropriate or proper to do so. During the previous award for these services, BAI protested the award that was made to Maden. On July 29, 2005, the United States Court of Federal Claims issued its decision addressing the merits of BAI's protest. The Court concluded that the award to Maden was arbitrary and capricious, 69 Fed. Cl. 431, 432 (2005). In its decision, the Court also found that the award to Maden "has resulted in injury to Beta Analytics International, Inc., in the form of the loss of key personnel to Maden Tech Consulting, Inc. and that this injury continues to exist and continues to render the procurement process, including the mandated re-procurement, arbitrary until the United States mitigates the injury through the adoption of an appropriate evaluation methodology for use in the re-procurement." Id at 435. Based on these facts, I feel that the integrity of the procurement system precludes the Government from continuing a contract determined to be unlawful in favor of one that it is merely alleged to have been awarded improperly.

5) Override the Stay pursuant to 31 U.S.C. Sec. 3553(d)(3)(c)(II) and Federal Acquisition Regulation (FAR) 33.104(c)(2)(ii). This is the only practical and effective option available to DARPA. As indicated above, DARPA needs the services to perform its mission and to protect national security. As of July 26, 2005, BAI has been at DARPA performing these vital services. It is the only contractor that I am aware of that has all the required personnel available to perform these services. The override will allow the Government employees to continue their inherently governmental functions without interruption Classified information can be adequately protected without endangering National Security. DARPA's other offices can continue its functions without interruption. DARPA can continue its research programs, which not only have long-term applications, but also have immediate applications for the military deployed in Iraq and Afghanistan, such as research on the detection of EID. I have read the law review article, *The Competition In Contracting Act's Automatic Stay Provision And Judicial Review: A Trap For The Unwary, 43 Admin. L. Rev. 439*, and I believe that having considered all the requirements of

Competition In Contracting Act, that there is an urgent and compelling reason why I should override the GAO stay.

DETERMINATION

The award to Beta Analytics International, Inc. requires the contractor to be responsible for supplying critical security services to DARPA and in turn to the national security. I determine that urgent and compelling circumstances significantly affecting the interests of the United States will not permit waiting for the decision of the Comptroller General.

Anthony J. Tether

Anthony J. Tether
Director
August 28, 2006

# In the United States Court of Federal Claims

No. 06-585C
Filed: August 28, 2006
**UNDER SEAL**[1]

| | |
|---|---|
| MADEN TECH CONSULTING INC., | * |
| Plaintiff, | * |
| v. | * |
| THE UNITED STATES, | * |
| Defendant, and | * |
| BETA ANALYTICS INTERNATIONAL, INC., | * |
| Defendant-Intervenor. | * |

## ORDER

Based on the Administrative Record, motions and memoranda filed by the parties, and argument presented at an August 25, 2006 hearing, the court has determined that the Defense Advanced Research Projects Agency ("DARPA")'s August 1, 2006 Determination and Finding, as supplemented on August 4, 2006, to override the automatic stay authorized under the Competition in Contracting Act is contrary to law in that it does not provide the court with a sufficient basis to ascertain whether the agency has complied with 28 U.S.C. § 1491(b)(4). *See* 5 U.S.C. § 706(2)(A) (directing the court to review agency action and set aside those that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

By operation of law, the automatic stay in DARPA's performance of Contract No. HR0011-06-C-0127 during the pendency of Plaintiff's bid protest before the General Accountability Office is reinstated. *See* 31 U.S.C. § 3553(d)(3)(A)(ii) (directing the agency to require that the contractor immediately cease contract performance while a bid protest is pending).

[1] This order will remain under seal until the General Accountability Office issues an opinion regarding the merits of the following related bid protest cases: *In re STG, Inc.*, No. B-298543.001 (July 28, 2006); *In re Maden Tech, Inc.*, No. B-298543.002 (July 31, 2006); and *In re STG, Inc.*, B-298543.003 (Aug. 15, 2006).

Plaintiff's Motion for Declaratory Judgment is GRANTED. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is DENIED.

The court also orders that the Director of DARPA, General Counsel, Assistant General Counsel, and all agency lawyers responsible for determining the appropriateness of issuing an agency override, pursuant to 31 U.S.C. § 3553(d)(3)(C), will read Judith A. Sokol, *The Competition in Contracting Act's Automatic Stay Provision and Judicial Review: A Trap for the Unwary*, 43 ADMIN. L. REV. 439 (1991) to assist them in ascertaining whether or not to issue a decision to override an automatic stay in the future, in this or other cases, and the required elements to provide the court with requisite findings on which to base a decision of compliance with 28 U.S.C. § 1491(b)(4).

**IT IS SO ORDERED.**

s/**Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**