IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **MADEN TECH CONSULTING, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. __________** |
| | ) | |
| **THE UNITED STATES** | ) | **REDACTED VERSION** |
| | ) | |
| **Defendant,** | ) | |
| | ) | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff, Maden Tech Consulting, Inc., d/b/a Maden Technologies ("Maden Tech"), as and for its Complaint against the Defendant, the United States of America, acting by and through the Defense Advanced Research Projects Agency ("DARPA"), alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff seeks declaratory relief against the United States, acting by and through the DARPA, in an order declaring that DARPA's August 29, 2006 override of the automatic stay of contract performance issued in the Government Accountability Office ("GAO") Protest B-298543.2 is arbitrary and capricious and violates 31 U.S.C. § 3553(d)(3) of the Competition in Contracting Act ("CICA"). Plaintiff also seeks preliminary injunctive relief against the United States, acting by and through the DARPA, in an order enjoining DARPA from continuing performance of Contract No. HR0011-06-C-0127 (the "Contract") for contractor support services for the Office of Management Operations/Security and Intelligence Directorate of DARPA until the Court rules on the merits of Maden Tech's request for a declaratory judgment.

2. Maden Tech is not requesting a determination on the underlying merits of its bid protest by this Court, and continues to pursue its challenges to the contract award at the GAO.

4822861

## PARTIES

3. Plaintiff, Maden Tech Consulting, Inc. d/b/a Maden Technologies ("Maden Tech") is a corporation with its principal place of business at 2110 Washington Boulevard, Suite 200, Arlington, Virginia 22204. Maden Tech is the incumbent on the contract preceding the Contract (the "predecessor contract"). Maden Tech has successfully performed all work under the predecessor contract.

4. The Defendant is the United States, acting by and through the Defense Advanced Research Projects Agency ("DARPA").

5. The awardee, Beta Analytics International, Inc. ("BAI" or "Beta"), is a subsidiary of Analex Corporation.

## JURISDICTION

6. This Court has jurisdiction over this action challenging DARPA's override of the automatic stay pursuant to 28 U.S.C. § 1491(b).

## FACTUAL ALLEGATIONS

**<u>The Solicitation</u>**

7. On February 13, 2006, DARPA issued Solicitation No. HR0011-06-R-0001 (the "Solicitation" or "RFP") seeking offers to provide services required to support the Security and Intelligence Directorate, which is under the Office of Management Operations (collectively, "SID"). The awardee was to provide and manage personnel and equipment, to include support provided to the contractor by subcontractors and consultants, to safeguard DARPA, U.S. Government and other resident property, personnel, and information, and to assure the continuity of the DARPA work effort.

8. The Solicitation stated that a contract would be awarded to the responsible offeror whose proposal was determined to be the most advantageous to the Government, cost and other

factors considered. That determination was to be made on a best value basis utilizing the trade off process where the technical factors combined were significantly more important than price.

9. The evaluation scheme of the Solicitation provided that the technical proposals were to be evaluated by the non-cost factors of Technical Approach, Personnel, and Past Performance. Technical Approach and Personnel were of equal importance and were both of greater importance than Past Performance. The technical factors combined were significantly more important than the Cost/Price factor. The evaluation criteria also stated that although the non-cost factors were significantly more important than cost/price, the importance of cost/price as a factor in the final determination increased as non-price factors of the proposal become closer in merit.

10. The Solicitation contemplated the award of one Cost-Plus-Award-Fee ("CPAF") contract with a one-year base and four one-year option periods.

**The Bridge Contract, New Contract Award and Protest**

11. Court orders in a separate proceeding before Judge Victor J. Wolski of this Court, *Beta Analytics International, Inc. v. United States*, No. 04-556C, required DARPA to conduct the procurement under the Solicitation and issue a contract award with a start date of no later than July 30, 2006. **Exhibit F.** While it was conducting this procurement under the Solicitation, on March 31, 2006, DARPA issued an entirely separate contract to Maden Tech, Contract No. HR001-06-C-0076 (the "Bridge Contract"), based on 10 U.S.C. § 2304(c)(2). **Exhibit G**, at 1, block 13. In the course of Maden Tech's performance of the separate Bridge Contract, DARPA fully complied with the Court order and awarded the new Contract to BAI under the Solicitation on or about July 19, 2006.

12. On Wednesday, July 19, 2006, DARPA notified Maden Tech that it awarded the Contract to BAI. DARPA did not inform Maden Tech when BAI was expected to commence performance.

13. Upon receipt of the award notification, Maden Tech immediately requested a debriefing in accordance with 48 C.F.R. § 15.506. In response to Maden Tech's request, DARPA scheduled and held an oral debriefing on the afternoon of Friday, July 28, 2006.

14. On Friday, July 28, 2006, the GAO notified DARPA that STG, Inc. ("STG"), another offeror, had filed a protest contesting DARPA's award of the Contract to BAI. Pursuant to 31 U.S.C. § 3553 and 48 C.F.R. § 33.104(c)(1), DARPA was required to immediately suspend BAI's performance of the Contract on July 28, 2006.

15. On July 31, 2006, the next business day after receiving its debriefing, Maden Tech filed a protest with the GAO contesting DARPA's award of the Contract to BAI. The GAO notified DARPA of Maden Tech's protest on July 31, 2006. Pursuant to 31 U.S.C. § 3553 and 48 C.F.R. § 33.104(c)(1), Maden Tech's protest also required DARPA to immediately suspend performance of the Contract pending disposition of the GAO protest.

16. GAO is required by 31 U.S.C. § 3554(a)(1) and 48 C.F.R. § 21.9(a) to resolve the protest within one hundred days from the date a protest is filed. The GAO is required to resolve Maden Tech's protest on or before November 8, 2006. The GAO is required to resolve STG's protest on or before November 24, 2006.

**DARPA's Initial Stay Override**

17. An automatic statutory stay of BAI's performance was immediately effective when the GAO notified DARPA of STG's protest on July 28, 2006.

18. DARPA unlawfully permitted BAI to continue performing the Contract until at least August 1, 2006, when it issued its initial override determination.

19. On August 1, 2006, DARPA issued an initial Determination and Findings (the "First D&F"), overriding the statutory stay of performance and permitting BAI to perform the disputed

Contract while Maden Tech and STG's protests were pending at the GAO. A true and correct copy of the First D&F is attached hereto as **Exhibit A**.

20. In its First D&F, DARPA contended that lifting the stay was necessary based on urgent and compelling circumstances. In support of its determination, DARPA set forth a general description of its mission. In addition, DARPA contended in its First D&F that:

> DARPA cannot have the previous contractor, Maden, to continue performance because the Federal Court of Claims determined that the award to Maden was arbitrary and capricious. To ask Maden to continue performance would not be in the best interest of the Government and would endanger the integrity of the procurement system by continuing an award the court has determined unlawful. In addition, if DARPA wanted to continue the performance by Maden, permission from the Federal Court of Claims would be required.

21. DARPA did not seek permission from the Court of Federal Claims to continue the performance of Maden Tech.

22. The First D&F concluded that "[t]he award to Beta Analytics International, Inc. requires the contractor to be responsible for supplying critical security services to DARPA and in turn to the national security. I determine that urgent and compelling circumstances significantly affecting the interests of the United States will not permit waiting for the decision of the Comptroller General."

23. On August 4, 2006, DARPA issued a second Determination and Findings (the "Second D&F"). A true and correct copy of the Second D&F is attached hereto as **Exhibit B**.

24. In support of its Second D&F, DARPA expanded on its general description of its mission.

25. The Second D&F concluded:

> in fulfilling these nationally important responsibilities, it is absolutely critical to the agency's mission for security support services to be in place. The award to Beta Analytics International, inc. requires the contractor to be responsible for supplying critical security services to DARPA and in turn to national security. I determine that urgent and compelling circumstances significantly affecting the interests of the United States will not permit waiting for the decision of the Comptroller General.

Thus, there is an urgent and compelling reason why I have determined that the override of the automatic stop work order is required.

26. DARPA's two basic justifications in the First and Second D&F to override the CICA automatic stay of performance were the agency's mission and responsibilities and an order of this Court determining that the prior award to the incumbent, Maden Tech, was arbitrary and capricious.

**Maden Tech's Successful Challenge of DARPA's Reliance on Prior Orders of this Court to Override the CICA Stay**

27. On August 7, 2006, Maden Tech challenged the validity of the First and Second D&F in a separate case pending before Judge Victor J. Wolski of this Court, *Beta Analytics International, Inc. v. United States*, No. 04-556C, through an Emergency Motion for Declaratory Judgment to Reinstate the Automatic Stay in Intervenor's GAO Protest, and For Leave to Amend This Court's Order Of March 15, 2006 (the "Emergency Motion"). The Emergency Motion challenged DARPA's reliance on Judge Wolski's previous orders as a justification to override the automatic statutory stay.

28. On August 8, 2006, Judge Wolski issued an Order (the "August 8th Order") granting Maden Tech's Motion in part, agreeing that DARPA's reliance on his prior orders as a basis for overriding the statutory stay of performance was improper. A true and correct copy of the August 8th Order is attached hereto as **Exhibit D**.

29. In the August 8th Order, Judge Wolski also denied the Emergency Motion without prejudice, stating, "[t]he Court takes no position on whether the circumstances are 'urgent and compelling,' warranting an override of the automatic stay." The August 8th Order reflected that Maden Tech would be required to "file a new case in our Court challenging the override, to be assigned randomly to another judge of our Court."

**Maden Tech's [redacted][1] Challenge of DARPA's First and Second Determinations and Findings**

30. After the Court's issuance of the August 8th Order, the only remaining justification in DARPA's First and Second D&F to support alleged "urgent and compelling circumstances" for overriding the statutory stay was the mission of the agency.

31. DARPA's remaining justification in the First and Second D&F for overriding the stay of performance did not meet the requirements of CICA to override the automatic statutory stay. The remaining reason relied on by the agency to lift the automatic stay was arbitrary and capricious, an abuse of discretion and otherwise in violation of law.

32. On August 11, 2006, Maden Tech challenged the validity of the First and Second D&F in a separate case before Judge Susan G. Braden of this Court, *Maden Tech Consulting, Inc. v. United States*, No. 06-585C, through a Complaint for Injunctive and Declaratory Relief.

33. [redacted]

34. [redacted]

**DARPA's Third Attempt To Override the Automatic Stay of BAI's Performance**

35. [redacted]

[1] Highlighted text indicates that the information is confidential and/or proprietary and is filed under seal.

36. DARPA did not suspend or terminate the Contract as required by the CICA, 31 U.S.C. § 3553(d)(3).

37. Instead of implementing the statutorily required stay of BAI's performance pending resolution of Maden Tech's and STG's pending GAO protests, DARPA issued yet another override permitting BAI to continue performing the disputed Contract.

38. On August 28, 2006, DARPA issued another Determination and Findings (the "Third D&F") attempting to justify its override of the statutory stay of BAI's performance. DARPA again contends that lifting the stay is necessary based on urgent and compelling circumstances. A true and correct copy of the Third D&F is attached hereto as **Exhibit C**.

39. In its Third D&F, DARPA repeats its justifications in the First and Second D&F. DARPA incorporates the arguments made in its pleadings filed in the action before Judge Braden in *Maden Tech Consulting, Inc. v. United States*, No. 06-585C.

40. DARPA's Third D&F again sets forth a general description of its mission. DARPA also summarizes the services to be provided under the Contract. DARPA makes a conclusory and unsupported assertion that it cannot complete its mission with its own employees.

41. DARPA's Third D&F purports to justify how it has no options other than continuing to use BAI over the next two months without endangering national security. DARPA wrongly claims that it cannot acquire the urgent services from another contractor without engaging in a "mini competition."

42. DARPA also wrongly claims that it cannot award an interim contract to Maden Tech.

43. DARPA's remaining reasons for lifting the automatic stay also fail to establish urgent and compelling reasons requiring BAI's continued performance of the Contract, particularly where

DARPA already had an incumbent contractor in place to perform the required security support services.

44. Mirroring the First D&F, the Third D&F erroneously concludes that "[t]he award to BAI Analytics International, Inc. requires the contractor to be responsible for supplying critical security services to DARPA and in turn to the national security. I determine that urgent and compelling circumstances significantly affecting the interests of the United States will not permit waiting for the decision of the Comptroller General."

45. DARPA's Third D&F offers no explanation or analysis as to why urgent and compelling circumstances required that the contractor performing the work when the stay was effective could not remain in place pending resolution of the corresponding bid protests.

46. DARPA's decision to override the stay of performance did not adequately consider the statutory mandate of ensuring competition in contracting and a fair and effective process at the GAO, as required by the Competition in Contracting Act.

47. DARPA's Third D&F reflects that DARPA made a clear error in judgment by continuing to override the CICA stay and permitting BAI to continue to perform.

48. DARPA's decision to override the automatic stay of contract performance pending the outcome of the bid protests was arbitrary, capricious, an abuse of discretion, and otherwise in violation of the Competition in Contracting Act.

49. For over a month now, DARPA has violated statutory and regulatory law be permitting BAI's continued performance of the Contract.

**COUNT I**
**(Declaratory and Injunctive Relief)**

50. Maden Tech incorporates by reference the allegations set forth in paragraphs 1 through 49 as if set forth herein.

51. A justiciable controversy exists between DARPA and Maden Tech as to the validity of the determination to override the mandatory stay of contract performance required by the Competition in Contracting Act.

52. DARPA's decision in its Third D&F to override the automatic stay of contract performance pending the outcome of a bid protest was arbitrary, capricious, an abuse of discretion, and otherwise in violation of the Competition in Contracting Act.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, Maden Tech, respectfully requests that this Court grant judgment in its favor, and grant the following relief:

(1) a declaration that DARPA's decision to override and lift the automatic stay of performance was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and therefore is invalid;

(2) a preliminary injunction prohibiting DARPA from permitting performance of the Contract until the Court rules on the merits of Maden Tech's request for a declaratory judgment;

(3) an award to Maden Tech of its reasonable fees, costs, interest, and expenses incurred in prosecuting this Complaint; and

(4) such other relief as the Court may deem just and proper.

Dated: August 31, 2006

Respectfully submitted,

T. Michael Guiffré

T. Michael Guiffré
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6441
(202) 457-6315 (Fax)

Attorney of Record for
Maden Tech Consulting, Inc.

Of Counsel:
Robert S. Brams
Elizabeth M. Gill
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
(202) 457-6315 (Fax)

GAO
Accountability * Integrity * Reliability
United States Government Accountability Office
Washington, DC 20548

# Facsimile Transmission Sheet

**Date:** December 4, 2006

Number of pages, including this cover sheet: 12

If transmission problems occur, please call 202-512-4788.
Our fax number is 202-512-9749.

**Re:** B-298543.2
Matter of Maden Technologies

**From:** Edward Goldstein, Senior Attorney

| Name | Firm/Agency | Phone | Fax |
|---|---|---|---|
| T. Michael Guiffre, Esq. | Patton Boggs LLP | 202-457-6441 | 202-457-6315 |
| Mary E. Clarke | Defense Advanced Research Projects Agency | 703-428-9195 | 703-428-1364 |
| Paul E. Pompeo, Esq. | Holland & Knight LLP | 202-457-7033 | 202-419-2913 |

**Comments:**

GAO Accountability * Integrity * Reliability

Comptroller General of the United States

United States Government Accountability Office
Washington, DC 20548

**DOCUMENT FOR PUBLIC RELEASE**
The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:** Maden Technologies

**File:** B-298543.2

**Date:** October 30, 2006

T. Michael Guiffré, Esq., Elizabeth M. Gill, Esq., Robert S. Brams, Esq., and James N. Schwarz, Esq., Patton Boggs LLP, for the protester.
Paul E. Pompeo, Esq., Joseph P. Hornyak, Esq., and Stuart W. Turner, Esq., Holland & Knight LLP, for Beta Analytics, Incorporated, an intervenor.
Mary E. Clarke, Esq., Defense Advanced Research Projects Agency, for the agency.
Edward Goldstein, Esq., and Christine S. Melody, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

**DIGEST**

1. Agency reasonably concluded that potential for conflict of interest stemming from awardee's proposed use of a subcontractor who had served as an evaluator for the agency in connection with a previous procurement was mitigated where the subcontractor had signed a non-disclosure agreement in connection with her performance as an evaluator and the agency reasonably found that the subcontractor did not aid the awardee in preparing its proposal other than to submit a subcontract proposal.

2. Protest alleging "bait and switch" where awardee requested permission from the agency to substitute nine personnel after award is denied where the record does not establish that the awardee knowingly or negligently misrepresented its intent to furnish the nine individuals for whom substitution was sought.

**DECISION**

Maden Technologies protests the award of a contract to Beta Analytics, Incorporated (BAI) under solicitation No. HR0011-06-R-0001, issued by the Defense Advanced Research Projects Agency (DARPA) for support services for the Security and Intelligence Directorate, under the Office of Management Operations at DARPA. Maden argues that the agency failed to address an organizational conflict of interest affecting BAI; BAI engaged in a "bait and switch" by substituting less qualified personnel after award as compared to the more highly qualified personnel identified in its proposal; the agency improperly evaluated Maden's proposal; the discussions

regarding its proposal were not meaningful; and the agency's source selection decision was flawed.

We deny the protest.

DARPA's mission is to serve as the central research and development organization of the Department of Defense with primary responsibility to maintain U.S. technological superiority over potential adversaries. As a consequence, DARPA is responsible for a number of secret and top secret programs. Agency Report (AR) at 2. DARPA's Security and Intelligence Directorate (SID) supports this mission by "planning, executing, and directing the information, personnel, industrial, information assurance, and physical security programs at DARPA and at specified contractor sites." RFP at 8.

On February 13, 2006, DARPA issued the RFP, which provided for the award of a cost-plus-award-fee contract with 1 base year and four 1-year options for services in support of the mission of SID. Specifically, DARPA sought a contractor to provide a "high quality professional security staff" to partner with SID in accomplishing its mission. RFP at 8. To accomplish this goal, the RFP's statement of work identified and described a total of 37 tasks required of the contractor in the areas of "security operations," "program security," and "security program planning and execution." RFP 9-21. Offerors were advised of the estimated level of effort needed to perform the tasks required under the statement of work and support SID in performing its mission for each contract period (base and options). In this regard, DARPA provided a list of required labor categories, the estimated hours for each labor category, and the estimated full time equivalents (FTE) for each labor category. In sum, DARPA estimated a need for 69 FTEs for the base and each option year. RFP at 75.

Under the RFP, award was to be made on a "best value" basis with proposals evaluated under the following factors: (1) technical approach, (2) personnel, (3) past performance, and (4) cost/price. Regarding the non-cost factors, the RFP provided that the technical approach and personnel factors were of equal importance and both were more important than the past performance factor. As set forth in the RFP, the best value determination was to be made using a trade-off process where the non-cost factors, when combined, were significantly more important than cost/price. The importance of cost/price, however, would increase as non-cost factors were determined to be closer in merit. RFP at 77, 81.

The technical approach factor contained four subfactors: (1) understanding of the statement of work; (2) management and execution of contract requirements; (3) staffing plan/teaming arrangements; (4) corporate support/facilities. The first three factors were of equal importance and were each more important that the last subfactor. Under the personnel factor, which did not include any subfactors, offerors were required to demonstrate that the personnel they proposed to staff the

contract met minimum qualification requirements for education and experience. For example, the RFP provided for a "program manager" position, which was considered a key personnel position, and indicated that the individual proposed for this position was required to have a bachelor's degree as well as 10 years of "qualifying, related experience," 5 years of which "shall be in the direction and management of Government funded programs in industry or within government entities, with 20 or more individuals under their cognizance." RFP at 31. The RFP further provided that for the purpose of evaluating proposals under the personnel factor, where the quality of personnel was considered equal, an offeror proposing currently employed personnel would be deemed equal to an offeror proposing personnel under letters of intent or commitment.

Past performance, the least important non-cost factor, included the following four equally weighted subfactors: (1) timeliness, (2) quality, (3) cost control, and (4) customer satisfaction. RFP at 80. The RFP directed offerors to submit past performance information concerning their performance of recent (within the past 5 years) and relevant contracts and subcontracts. For each contract identified, offerors were to include, among other things, total award value, contact information for the government technical point of contact and/or the contracting officer's representative for the contract, a brief description of the types of tasks involved under the contract, and details on the tasks under the contract that were relevant to the tasks of the RFP. RFP at 71. As provided in the RFP, past performance information was deemed relevant if the information related to the offeror's performance of "similar tasks found in this RFP's Statement of Work <u>and</u> was performed for [the Department of Defense], one of the services, or the intelligence community." RFP at 71.

The solicitation further informed offerors that DARPA could obtain and consider past performance information from other sources such as the Defense Contract Management Agency, Contractor Performance Assessment Reporting System (CPARS), the Department of Defense's Past Performance Information Retrieval System, and "other past performance information provided by a Government employee (including those persons referenced in the Offeror's Past Performance proposal), etc.) to supplement or validate the information in the Past Performance proposal." RFP at 72.

Regarding the evaluation of cost/price, the RFP, as amended, provided that DARPA would evaluate proposed cost/price for reasonableness and realism and indicated that a cost realism evaluation would be performed to determine each offeror's most probable cost to the government and to assess the offeror's understanding of the requirements of the RFP. The evaluated cost was to be the higher of either (a) the sum of the offeror's proposed total estimated cost and fee or (b) the government's determination of the offeror's most probable total cost and fee.

Five offerors, including Maden and BAI, submitted timely proposals by the solicitation's March 16, 2006 closing date. To evaluate proposals, DARPA convened a technical evaluation panel (TEP), a past performance evaluation panel (PPEP) and a cost/price evaluation panel (C/PEP). With regard to the non-cost factors, the evaluators ranked each proposal under the various factors and subfactors utilizing the following color/adjectival ratings, blue/exceptional, green/acceptable, yellow/marginal, red/unacceptable, and grey/neutral (past performance only). Based on initial proposals, the agency rated Maden and BAI as "green" overall for "technical approach," with each receiving "green" ratings for all of the "technical approach" subfactors.

As it relates to the protest, under the subfactor "staffing plan/teaming arrangement," the TEP noted weaknesses with Maden's plan for addressing "surge" requirements. Specifically, the TEP noted that Maden proposed to address surge requirements by [**deleted**]. The TEP expressed concern with this plan since[**deleted**]. AR, Tab 10, Maden TEP Consensus Report, at 7. According to the TEP, this weakness was "slightly below standards/expectations."[1] Moreover, the TEP concluded that Maden's "ability to meet a temporary surge requirement lacks depth" due to its reliance on [**deleted**]. Id. In the TEP's view, this was "extremely short [sighted] because [**deleted**]. Id. This was "clearly below standards/expectations" in the TEP's view. Id.

Moreover, in assigning Maden's proposal a "green" rating under the "corporate support and facilities" subfactor within the technical approach factor, the TEP found no strengths and three weaknesses, which were "slightly below standards/expectations." Specifically, the TEP found that Maden had failed to articulate a corporate philosophy that supports the required effort, its support staff resources lacked commitment and seemed only to be available on a "crisis basis," and Maden had identified a budget position outside the scope of the solicitation. AR, Tab 10, Maden TEP Consensus Report, at 9. Overall, the TEP concluded that Maden had "proposed to provide Corporate Support/Facilities that meet the expectations of the RFP. . . [**deleted**] . . . [b]ased on the weighting of the subfactors, the consensus of the panel is that the Offeror's proposed technical approach is acceptable." Id..

---

[1] The evaluators identified each weakness as: (1) "slightly below standards/expectations"; "clearly below standards/expectations"; or "significantly below standards/expectations." For each strength, the evaluators indicated whether it was: "slightly above standards/expectations in a way that benefits the agency"; "clearly above standards/expectations in a way that benefits the agency"; or "significantly above standards/expectations in a way that benefits the agency." TAB 8, Source Selection Plan, at 24.

Under the past performance factor, Maden and BAI both received the highest overall rating of "blue" or "exceptional," with ratings under the various subfactors as follows:

| Offeror | Subfactor (a): Timeliness | Subfactor (b): Quality | Subfactor (c): Cost Control | Subfactor (d): Customer Satisfaction | Overall Rating |
|---|---|---|---|---|---|
| **BAI** | Blue | Blue | **Green** | Blue | Blue |
| **Maden** | Blue | Blue | Blue | **Green** | Blue |

AR at 35.

In reviewing BAI's past performance, the PPEP identified numerous strengths and no weaknesses under any of the subfactors. In evaluating Maden's past performance, DARPA determined that Maden's past performance had numerous strengths as well; however, under the customer satisfaction subfactor, the agency noted information concerning Maden's performance as the incumbent contractor, which it received from an interview with Robert Copeland, the director of SID and the government's on-site technical representative for the incumbent contract. In his assessment of Maden's incumbent performance, Mr. Copeland rated Maden as "exceptional" for timeliness and quality, but "marginal" for cost control and customer satisfaction. With regard to customer satisfaction, Mr. Copeland noted that Maden was, at times, "not reasonable, dismissing a qualified employee and suggesting a replacement costing three times as much"; and observed an "'overall' absence of support by the corporate office which led to qualified people leaving the contractor." AR, Tab 10, Maden's Contractor Past Performance Questionnaires.

Under the personnel factor Maden and BAI were both initially rated as "yellow" or marginal, principally due to the fact that many of their proposed personnel did not meet qualification requirements set forth in the RFP. DARPA determined that [**deleted**] of Maden's 69 personnel did not meet the RFP's qualification requirements and that [**deleted**] of BAI's 69 personnel were not qualified. Because none of the offerors met the RFP's qualification requirements for all 69 FTEs, and recognizing that, based on its knowledge of the labor market, "it is unlikely that any offeror can propose personnel for all 69 FTEs meeting the minimum requirements specified," DARPA amended the solicitation to specify that those offerors submitting "a preponderance of resumes meeting the FTE's position requirements" would be evaluated as "minimally compliant" under the personnel factor. RFP amend. 4.

After issuance of the amendment, DARPA held discussions with the offerors, including Maden and BAI, during which DARPA specifically informed Maden and BAI of the proposed personnel who were deemed unqualified and the basis for that determination. In response, Maden and BAI both submitted revised proposals with revised personnel. Based on its evaluation of the revised personnel, DARPA rated both Maden and BAI as "green" or "acceptable" under the personnel factor. In rating

Maden and BAI as acceptable, the TEP found that [**deleted**] of Maden's 69 revised proposed personnel met the solicitation's stated qualification requirements and that [**deleted**] of the 69 individuals proposed by BAI met the qualification requirements.

The evaluation teams submitted their evaluation results to the source selection evaluation board (SSEB), which reviewed the reports and agreed with all of the ratings. Based on its assessment of the proposals, the SSEB concluded that BAI's proposal, with an evaluated cost of $65.8 million, was the best value and that Maden's technical proposal did not offer any strengths worth its higher evaluated cost of $68.2 million. The source selection authority (SSA) agreed with the SSEB's recommendation for award to BAI, explaining that BAI and Maden both had "excellent" past performance records and various strengths; however, as compared to Maden, BAI proposed a greater number of qualified personnel and had a lower evaluated cost. In the SSA's view, Maden's evaluated strengths did not warrant its increased cost.

Upon learning of the agency's decision to make award to BAI, and after receipt of a debriefing, Maden filed the subject protest with our Office. In its protest, Maden alleges that BAI should have been eliminated from the competition because of multiple improper conflicts of interest and that BAI engaged in an improper "bait and switch" by substituting less qualified personnel after award as compared to the more highly qualified personnel identified in its proposal. Maden also argues that the agency failed to properly evaluate its proposal, failed to hold meaningful discussions, and that the best value decision was unreasonable.

CONFLICTS OF INTEREST

With regard to the conflict of interest issues, Maden first contends that BAI had an "unfair competitive advantage" due to the fact that Robert Copeland, the director of SID, is a former BAI employee and supervised two of the evaluators who participated in the procurement. Maden further alleges, based on "information and belief," that Mr. Copeland or other DARPA employees granted BAI "special access" to the project site prior to the award of the contract. Maden also argues that DARPA failed to properly consider the fact that BAI had an unfair advantage due to its teaming with Marianne Carter; according to Maden, Ms. Carter had worked as an evaluator for DARPA on a previous procurement wherein Maden had submitted a proposal and thus had access to Maden's "proprietary information."

Regarding Mr. Copeland's involvement in the procurement, contracting agencies, as a general matter, are responsible for reviewing potential conflicts of interest posed by relationships between evaluators and offerors in order to ensure impartiality in the evaluation and to preserve the integrity of the procurement process. Laerdal Med. Corp., B-297321, B-297321.2, Dec. 23, 2005, 2006 CPD ¶ 12 at 6-7; DRI/McGraw-Hill, B-261181, B-261181.2, Aug. 21, 1995, 95-2 CPD ¶ 76 at 3. Where, as here, a protester infers that agency officials are biased because of their past experiences or

relationships, we focus on whether the individuals involved exerted improper influence in the procurement on behalf of the awardee, or against the protester. See George A. Fuller Co., B-247171.2, May 11, 1992, 92-1 CPD ¶ 433; Advanced Sys. Tech., Inc.; Eng'g and Prof. Servs., Inc., B-241530, B-241530.2; Feb. 12, 1991, 91-1 CPD ¶ 153 (no evidence of bias by evaluation panel member who was formerly employed by the awardee's subcontractor).

Here, the record reflects that Mr. Copeland was employed with BAI from 2000 to 2003 and upon leaving BAI became an employee of the federal government. The record further reflects that Mr. Copeland has no financial interest in BAI. There is no evidence suggesting that the evaluators under Mr. Copeland's supervision knew of his former employment with BAI, or were improperly influenced by Mr. Copeland in performing their duties as evaluators. While Maden alleges that Mr. Copeland took direct action to benefit BAI by granting BAI "special access" to the project site, there is no evidence to support Maden's bare assertions in this regard. (Nor is there any indication of the advantage to be gained by such access, particularly given that Maden itself held the incumbent contract and had full access to the project site.) As explained by the agency, it conducted the procurement "off-site" via a secured network, Mr. Copeland did not have access to this site, and DARPA visitor logs reflect that BAI was not granted access to DARPA until after award. Since Maden has presented no evidence, and the record does not indicate, that Mr. Copeland exerted any improper influence for BAI or against Maden, we have no basis to object to DARPA's evaluation on the basis of any alleged conflict of interest.[2]

Maden's argument that BAI's teaming arrangement with Marianne Carter presented an organizational conflict of interest (OCI) which should have resulted in BAI's exclusion from the competition, is similarly unsubstantiated and without merit. Contracting officers are required to identify and evaluate potential OCIs as early in the acquisition process as possible, and to avoid, neutralize, or mitigate potential significant conflicts of interest so as to prevent an unfair competitive advantage or the existence of conflicting roles that might impair a contractor's objectivity. Federal Acquisition Regulation (FAR) §§ 9.504(a); 9.505. OCIs, as

---

[2] As noted above, Mr. Copeland also was the government's technical representative for the incumbent contract and in that capacity provided information which the PPEP used in the evaluation of Maden's past performance. In challenging its past performance evaluation, Maden argues that Mr. Copeland's bias was reflected by his rating of Maden's performance on the incumbent contract as "marginal." This assertion, however, is belied by the fact that Mr. Copeland rated Maden as "marginal" under only two of the four factors he considered. Under the other two factors, he rated Maden as "exceptional." These facts do not suggest that Mr. Copeland acted with bias to skew the evaluation in favor of BAI or against Maden. In any event, Maden received the highest rating of "blue" "exceptional" under the past performance factor.

addressed in FAR subpart 9.5 and the decisions of our Office, can be broadly categorized into three groups. The first group consists of situations in which a firm, as part of its performance of a government contract, has in some sense set the ground rules for the competition for another government contract by, for example, writing the statement of work or the specifications. FAR § 9.505-2; Aetna Gov't Health Plans, Inc.; Found. Health Fed. Servs., Inc., B-254397.15 et al., July 27, 1995, 95-2 CPD ¶ 129 at 13. The second group, which Maden alleges is relevant in this case, consists of "unequal access to information" situations in which a firm has access to nonpublic information as part of its performance of a government contract and where that information may provide the firm an unfair competitive advantage in a later competition for a government contract. FAR § 9.505-4; Aetna Gov't Health Plans, Inc.; Found. Health Fed. Servs., Inc., supra, at 12. The third group reflects concerns about a firm's "impaired objectivity" and comprises cases where a firm's work under one government contract could entail its evaluating itself or a related entity, thus undermining the firm's ability to render impartial advice to the government. FAR § 9.505-3; Aetna Gov't Health Plans, Inc.; Found. Health Fed. Servs., Inc., supra, at 13.

The responsibility for determining whether an actual or apparent conflict will arise, and to what extent a firm should be excluded from the competition, rests with the contracting agency. RMG Sys., Ltd., B-281006, Dec. 18, 1998, 98-2 CPD ¶ 153 at 4. Contracting officers are to exercise "common sense, good judgment, and sound discretion" in assessing whether a significant potential conflict exists and in developing appropriate ways to resolve it. FAR § 9.505; Epoch Eng'g, Inc., B-276634, July 7, 1997, 97-2 CPD ¶ 72 at 5. We will not overturn a contracting officer's determinations in this area except where they are shown to be unreasonable. SRS Techs., B-258170.3, Feb. 21, 1995, 95-1 CPD ¶ 95 at 9.

As an initial matter, in addressing this issue, we note that Maden fails to describe the nature of the prior procurement in which DARPA utilized the services of Ms. Carter as an evaluator, nor does Maden explain how the "proprietary information" it provided in connection with that procurement could have provided BAI with an advantage under the current solicitation. In any event, the record reflects that the contracting officer recognized the potential for a conflict resulting from BAI's use of Ms. Carter as a subcontractor, given her work as an evaluator on a prior DARPA procurement, and that he conducted an inquiry into her involvement in the preparation of BAI's proposal. Specifically, he solicited independent statements from both BAI and Ms. Carter to determine "exactly what information was shared between BAI and [Carter] and to confirm that no source selection information or proprietary information was released." AR, Tab 22, Source Selection Significant Event, SSP Deviations, and amend. 4 Justification, at 3. Based on the statements received, the contracting officer was satisfied that Ms. Carter did not provide any information to BAI on how it should structure its proposal and found that her participation was limited to the submission of a subcontract proposal. Moreover, the contracting officer confirmed that Ms. Carter had signed a non-disclosure agreement in connection with her services as an evaluator for DARPA, which prohibited her

from disclosing any source selection or proprietary information she may have obtained while serving as an evaluator. Upon reviewing the matter with the SSEB chairperson and agency counsel, the contracting officer concluded that the "potential OCI was effectively mitigated." AR, Tab 22, Source Selection Significant Event, SSP Deviations, and amend. 4 Justification, at 3-4). Based on this record there is nothing to support Maden's contention that BAI should have been excluded from the competition based on proposing Ms. Carter as a subcontractor, and Maden has not shown otherwise.

"BAIT AND SWITCH"

Maden next argues that BAI engaged in an impermissible "bait and switch" by substituting nine personnel identified in its proposal with less qualified personnel. To establish an impermissible "bait and switch," a protester must show that a firm either knowingly or negligently represented that it would rely on specific personnel that it did not expect to furnish during contract performance, and that the misrepresentation was relied on by the agency and had a material effect on the evaluation results. Computers Universal, Inc., B-292794, Nov. 18, 2003, 2003 CPD ¶ 201 at 3. Where an offeror provides firm letters of commitment and the names are submitted in good faith with the consent of the respective individuals, the fact that the offeror, after award, provides substitute personnel does not make the award improper. RONCO Consulting Corp., B-280113, Aug. 11, 1998, 98-2 CPD ¶ 41 at 6.

The record reflects that approximately 8 days after contract award, BAI requested permission from DARPA to substitute 9 of the 69 personnel whom BAI had proposed in its revised proposal with individuals who were originally proposed by BAI and found to lack the RFP's qualification requirements. In its proposal, BAI had provided supporting letters of commitment/intent signed by each of the nine individuals for whom substitution was proposed. In its letter to DARPA requesting approval of the substitution–all personnel changes required DARPA's pre-approval[9]–BAI explained its reasons for the substitutions, indicating that six of the nine personnel had decided to accept other employment or to remain with their current employer; in this regard, BAI noted that the contract announcement was delayed well beyond the original April 10 award date. Two of the nine requested substitutions were the result of movement of personnel within BAI; the record reflects that one of these substitutions was directed by DARPA. The final personnel substitution resulted from BAI's determination that it was more cost-effective to replace the proposed individual, who lived in California and thus required relocation expenses, with an incumbent employee who received a lower salary and did not require relocation. In its request to substitute personnel, BAI further highlighted the need to retain

[9] The RFP expressly stated that "replacements for all personnel shall be approved by the [Contracting Officer's Representative] and Contracting Officer prior to their assumption of duties on the contract." RFP, Amend. 0004 ¶ C.9.1(b).

incumbent employees due to the compressed transition period implemented by the agency.[4] Given these facts, there is no basis to conclude that BAI knowingly or negligently misrepresented its intent to furnish the nine individuals sought for substitution.[5]

PAST PERFORMANCE EVALUATION AND DISCUSSIONS

Maden challenges its green/acceptable rating under the past performance subfactor "customer satisfaction" arguing that DARPA improperly considered Mr. Copeland's negative assessment of its performance on the incumbent SID contract and that it was denied meaningful discussions because it was not afforded an opportunity to comment on Mr. Copeland's assessment. The record, however, shows that Maden received the highest rating under the past performance factor, "blue" or "exceptional", and there is no indication in the source selection record that the "customer satisfaction" past performance subfactor rating had any bearing on the selection decision.

OTHER ISSUES

In its initial protest, Maden challenges the agency's evaluation of its technical proposal, alleging that the agency misevaluated its proposal under the subfactor "staffing plan/teaming arrangement" by identifying a weakness in its plan to provide "surge" staffing, and by failing to identify strengths under the subfactor "corporate support/facilities" based on its proposing an [**deleted**]. Protest at 7. In its comments responding to the agency report (in which the agency provided a specific response to these assertions), Maden did not rebut the agency's position and, indeed,

[4] The RFP contemplated a 1-month "transition period" during which the incumbent and awardee would be under contract and performing contract duties. However, upon award, BAI was instructed to begin full performance of all contractual duties within 5 business days.

[5] In arguing that BAI engaged in a "bait and switch," the protester maintains that DARPA improperly allowed BAI to substitute the nine individuals identified in its proposal with less qualified personnel. Maden does not argue, and there is no indication in the record, that, at the time DARPA evaluated BAI's proposed personnel, DARPA's evaluation was inconsistent with the stated evaluation criteria, or that DARPA waived the RFP's personnel requirements with respect to BAI. Rather, Maden bases it protest on DARPA's and BAI's actions during BAI's performance of the SID contract, specifically, DARPA's approval of BAI's request to substitute certain personnel identified in its proposal, with less qualified individuals. The propriety of this approval, however, presents a matter of contract administration which our Office will not review. 4 C.F.R. § 21.5(a) (2006); RONCO Consulting Corp., supra, at 6.

made no mention of these issues. In such circumstances, we deem the initially-raised arguments abandoned.[6] Citrus College; KEI Pearson, Inc., supra. For the first time in its supplemental comments, Maden also raised several issues concerning DARPA's evaluation of its cost, personnel, and staffing. These issues are untimely since they were evident from the agency's initial report, but Maden did not raise these issues until more than 10 days later in its supplemental comments. 4 C.F.R. § 21.2(a)(2).[7]

The protest is denied.

Gary L. Kepplinger
General Counsel

---

[6] In supplemental comments on a supplemental agency report, Maden essentially restated these original bases of protest. Nonetheless, where, as here, an agency provides a detailed response to a protester's assertions and the protester provides a response that merely restates the original allegation without substantively rebutting the agency's position, we deem the initially-raised arguments abandoned. Citrus College; KEI Pearson, Inc., B-293543 et al., Apr. 9, 2004, 2004 CPD ¶ 104 at 8 n.4. We therefore will not consider these arguments.

[7] Because we conclude that Maden's evaluation challenges are without merit or otherwise not for consideration, Maden's objection to the best value decision–based solely on the alleged evaluation improprieties–likewise is without merit.